Flynn et al. *v.* Horst (et al., Appellant).

Argued January 28, 1947. Before MAXEY, C. J., LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Ralph B. Umsted,* Deputy Attorney General, with him *Samuel M. Jackson,* Deputy Attorney General, and *T. McKeen Chidsey,* Attorney General, for appellant.

*Willis F. Daniels,* with him *Elmer E. Harter, Rose Daniels* and *Daniels & Harter,* for appellees.

OPINION BY MR. CHIEF JUSTICE MAXEY, January 30, 1947:

This is an appeal from the decree of the court below adjudging so much of section 2 of the Act of May 29, 1901, P. L. 327, as amended by the Act of June 5, 1913, P. L. 412, section 1, 31 PS 802, which imposes license fees of $500 upon wholesale dealers in oleomargarine and $100 upon retail dealers of oleomargarine, unconstitutional and void, and enjoining the defendants and their agents from attempting to collect such fees as a condition precedent to the wholesale and retail dealers engaging in the business of selling oleomargarine.

The matter came before the court upon bill, answer and testimony. The bill was brought to test the constitutionality of the license feature of the Act of 1901, P. L. 327, as amended. Four plaintiffs are engaged in retail sale of meats and groceries, and one is engaged in the sale of such products at wholesale, all of whom operate their own establishments, and have money invested therein.

The provisions of the Act challenged make it unlawful to sell oleomargarine without having first obtained a license at retail by paying $100 and at wholesale by paying $500. The license to manufacture oleomargarine costs $1,000. The proprietor of a hotel or restaurant must pay $50 for a license. The proprietor of a boarding house must pay $10 for a license. Each license is issued for one year. Heavy penalties are prescribed for violations. The Act charges the Dairy and Food Commissioner, now known as the Director of the Bureau of Foods and Chemistry, with the enforcement of the Act, and permits any citizen to bring suit for violation. It provides that the money paid into the Treasury shall constitute a special fund for the use of the Department of Agriculture for the enforcement of the Act. The bill avers (1) that oleomargarine is that defined by the Pennsylvania Bureau of Foods and Chemistry "as the oleaginous product composed wholly or in part of fat other than butter fat, with incorporated water, and may contain salt, and casein, and must not be colored in imitation of butter"; (2) that oleomargarine is a pure, wholesome and nutritious food which must conform to the definitions and standards of oleomargarine as promulgated by the Federal Security Administrator, effective September 1, 1941, pursuant to the Federal Food, Drug and Cosmetic Act of 1938, as amended; and (3) that the oleomargarine law is an arbitrary and unreasonable interference with business and imposes harsh and unreasonable restrictions upon a lawful occupation, and constitutes an abuse of the police power, in violation of the 14th Amendment to

the Constitution of the United States, Article I, sections 1, 9, and 26, of the Constitution of Pennsylvania, and Article III, section 7, of the Constitution of Pennsylvania, because the fees imposed are far in excess of the costs of issuing the licenses and policing the business.

The answer does not controvert the facts pleaded but denies the averments as to the Act's unconstitutionality. President Judge HARGEST of the court below succinctly defined the issue involved as "whether the license fees of $100 per year for retailers and $500 per year for wholesalers, of oleomargarine, have a reasonable relation to the amount of money necessary to be expended for the enforcement of the oleomargarine statute."

The court found, inter alia, that one plaintiff, Yorty, would handle oleomargarine except for the cost of the license. Another, Flynn, has a license, sells 20 pounds of butter per day and five or six pounds of oleomargarine, and does not sell, and has not sold, enough oleomargarine during this year to pay his proportion of the license. Another plaintiff, Yorktowne Wholesale Grocery Company, a wholesaler, would sell oleomargarine except that the $500 license fee would be prohibitive. It is agreed that the other plaintiffs would give cumulative testimony.

The court also found that the amount of cash received from the issuance of oleomargarine licenses for the biennium 1931-33 was $649,768.29 and that the amount expended by the Pennsylvania Department of Agriculture for the enforcement of all the statutes under its supervision for that biennium was $337,189.22. For the biennium 1943-45, the amount of cash received from oleomargarine licenses was $1,121,763.18. The amount of expenditures by the Department for the enforcement of all laws for the same period was $239,-802.32. For the fiscal year 1945-1946, the amount of cash received from oleomargarine licenses was $533,-562.35, and the amount expended by the Department in the enforcement of all laws was $144,405.61. For all

the fiscal years between 1931 and 1946, the amount collected from oleomargarine licenses ranges from two to five times the amount expended by the Bureau of Foods and Chemistry in the enforcement of all the laws, the enforcement of which is charged to that Bureau.

The court also found the following facts: In 1939 there were 33,799 retail grocers in Pennsylvania, of whom 3,767 held retail licenses to sell oleomargarine; there were approximately 1,259 wholesale dealers, of whom 24 held wholesale licenses. From 1931 to date there have been no manufacturer's licenses. In 1935 there were 34,451 retail dealers, and 4,191 holding oleomargarine licenses; and in 1929 there were 36,888 retail licenses, but the number of oleomargarine licenses is not given. In 1946, up to October 15, there were 5,171 retail licenses, and 46 wholesale licenses. There are approximately 37 Acts of Assembly, the enforcement of which is charged to the Bureau of Foods and Chemistry, and, of these, approximately 32 separate and distinct Acts regulating the manufacture and sale of hundreds of different kinds of foods and agricultural products, the enforcement of which is charged to that Bureau. There is no available estimate of the number of persons assigned to the work of the enforcement of the oleomargarine statute, because the licensing is periodic and requires additional help at certain times of the year. There are five agents generally assigned to handle the enforcement of the oleomargarine and carbonated beverage statutes, although the full time of no single individual is required throughout the year. Among all the products, the enforcement of which is committed to the Bureau, placed by the 37 Acts of Assembly above referred to, the only license fees required are (a) in the ice cream industry, for the production of 100,001 gallons or less $10 per year, 100,001 gallons to 250,000 gallons $50 per year, 250,001 gallons and upwards $100 per year; (b) carbonated beverage and still drink licenses $50 per year; and (c) bakery license, 50 pounds to 100 barrels of flour per week $5 per year, 100 to 200 barrels

of flour per week $20 per year. The other statutes subjecting the sale of food items to the supervision of the Bureau of Foods and Chemistry require no license fees. Oleomargarine or margarine is a pure, wholesome, and nutritive article of food, and is made from ingredients, all of which are pure, wholesome, and nutritive.

President Judge HARGEST in his adjudication aptly said: "The license fees exacted by the Act in question must be sustained, if at all, under a proper exercise of the police power. . . . But while it is for the legislature to determine in the first instance what laws and regulations are needed to carry out these ends, the courts may determine whether the regulations have some reasonable relation to those ends. Powell v. Commonwealth, 114 Pa. 265, 7 A. 913."

The court below also cited the following statement from *White's Appeal*, 287 Pa. 259, 134 A. 409: "While the tribunal to determine the proper exercise is in the first instance the legislature, the ultimate decision rests with the courts. If after investigating there is doubt as to whether the statute is enacted for a recognized police object, or if, conceding its purpose, its exercise goes too far, it then becomes the judicial duty to declare the given exercise of the police power invalid (citing cases). 'The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police power is not final or conclusive, but is subject to the supervision of the courts' " (citing cases).

In *Schollenberger v. Pennsylvania*, 171 U. S. 1, the United States Supreme Court held that Act No. 21 of the Legislature of Pennsylvania enacted May 21, 1885, prohibiting the manufacture or sale of any oleaginous substance, or any compound of the same, other than that produced from unadulterated milk or of cream from the same, any article designed to take the place of butter or cheese produced from pure unadulterated milk, or

cream from the same, or of any imitation or adulterated butter or cheese, was invalid to the extent that it prohibits the introduction of oleomargarine from another State, and its sale in the original package. In that case Justice PECKHAM, speaking for the United States Supreme Court, said: ". . . it may be admitted that oleomargarine in the course of its manufacture may sometimes be adulterated by dishonest manufacturers with articles that possibly may become injurious to health. Conceding the fact, we yet deny the right of a State to absolutely prohibit the introduction within its borders of an article of commerce, which is not adulterated and which in its pure state is healthful, simply because such an article in the course of its manufacture may be adulterated by dishonest manufacturers for purposes of fraud or illegal gains. The bad article may be prohibited, but not the pure and healthy one."

It was undisputed in this case that oleomargarine is a wholesome and nutritious product and that all the oleomargarine involved in this case was transported and sold in interstate commerce. The court below based its decision upon the following legal conclusions: (1) No reasonable relation exists between the amount of money collected by the Bureau of Foods and Chemistry from the licensing fees for retailers and wholesalers under the provisions of the Oleomargarine Act of 1901, P. L. 327, as amended, and the amount of money expended for the enforcement of said Act. (2) The fees provided by the said Oleomargarine Act of 1901, P. L. 327, as amended, for the wholesale and retail sale of oleomargarine, are unreasonable, confiscatory, and discriminatory, and constitute an illegal restraint of trade. (3) The facts and circumstances surrounding the sale of oleomargarine, as proved in the trial of this case, are different from those which appear in other cases of this Commonwealth involving the sale of oleomargarine. (4) The fees imposed upon wholesale and retail dealers in oleomargarine cannot be justified under the exercise

of the police power. (5) The unconstitutionality of the unreasonable, excessive, and confiscatory fees imposed upon wholesale and retail dealers of oleomargarine is not cured by the age of the statute. (6) The Oleomargarine Act of 1901, P. L. 327, as amended, violates Article I, sections 1 and 9, of the Constitution of Pennsylvania, and the 14th Amendment to the Constitution of the United States.

The Commonwealth contends that the Act challenged imposes a *tax* rather than a *license fee*. This contention is without merit. The title of the Act, so far as the title is pertinent to the question now before us, is "An Act . . . to provide for license fees to be paid by manufacturers, wholesale and retail dealers, and by proprietors of hotels, restaurants, dining-rooms and boarding houses; for the manufacture or sale of oleomargarine, butterine, or other similar products, not colored in imitation of yellow butter; and to regulate the manufacture and sale of oleomargarine, butterine, or other similar products, not colored in imitation of yellow butter; . . . and prevent and punish fraud and deception in such manufacture and sale as an imitation butter . . ."

The court below well said: "The money [for these licenses] is earmarked for the enforcement of the law, which is the special function of license fees; and there is not a syllable elsewhere in the Act which would indicate that the legislature intended it to be a tax measure. It is purely and simply a police regulation. The name given a license law by the legislature is not controlling if, in fact, a tax is intended to be imposed. And, in determining the type or kind of tax, the substance of the law, rather than a designation or a name given it by the legislature, must be considered, and such determination must be drawn from the incidents as well as from the language employed in the Act or ordinance. Applying this rule, this statute does not impose a tax. It is undoubtedly a revenue-raising statute; but, by its title, the legislature only intended to provide 'for license fees', and, by Section 12 of the Act, it definitely pro-

vided 'the money paid into the Treasury under the provisions of this Act shall constitute a special fund, for the use of the Department of Agriculture in enforcing the law.' The Fiscal Code of 1927 abolished all special accounts except certain excepted ones, and the oleomargarine fund was not excepted, but this did not change the facts that under the Oleomargarine Act the license fees were designated for a special purpose. It merely changed the manner in which the money was to be carried on the books of the Commonwealth. Such provision could not have saved an unconstitutional enactment; and if the license fees are unconstitutionally excessive, the change in the mode of bookkeeping would not save them."

The opinion of the court below also contains the following pertinent quotation from *Rock v. Philadelphia*, 127 Pa. Superior Ct. 143, 191 A. 669 : "A revenue tax may not be imposed under the guise of a police regulation, and this principle applies equally to the state or a municipality as a subdivision thereof. As Mr. Justice ELKIN stated in *Kittanning Boro. v. American Natural Gas Co.*, 239 Pa. 210, 86 A. 717; 'If anything can be considered as settled under the decisions of our Pennsylvania courts it is that municipalities under the guise fee imposed under the police power for the purpose of of a police regulation cannot impose a revenue tax.' (See cases cited). . . . The distinction between a license regulation and a tax imposed for revenue is set forth at length in State v. Anderson, 144 Tenn. 564, 234 S. W. 768, 19 A. L. R. 180. As stated in 4 Cooley on Taxation (4th Ed.) page 3552, section 1809, 'A fee for the license . . . must be such a fee only as will legitimately assist in the regulation; and it should not exceed the necessary or probable expense of issuing the license and of inspecting and regulating the business which it covers.' " The decree in the *Rock* case was affirmed by the Supreme Court on the opinion of Judge CUNNINGHAM of the Superior Court: 328 Pa. 382, 196 A. 59.

37 C.J., section 9, at page 171, makes this statement: ". . . A license or occupation tax, however, is imposed as a condition or as an element of the conditions upon the right to exercise a given privilege, its primary object being to regulate and control the business affected, and while the tax itself may not always be the sole condition, yet its payment is invariably made a part or a factor in the conditions upon which a business may be conducted. The character of a tax as a property tax or a license or occupation tax must be determined by its incidents, and from the natural and legal effect of the language employed in the act or ordinance, and not by the name by which it is described, or by the mode adopted in fixing its amount. If it is clearly a property tax, it will be so regarded, even though nominally and in form it is a license or occupation tax; and, on the other hand, if the tax is levied upon persons on account of their business, it will be construed as a license or occupation tax, even though it is graduated according to the property used in such business, or on the gross receipts of the business." In *International Text Book Co. v. Tone,* 220 N. Y. 313, 115 N. E. 914, Judge, afterwards Chief Judge, CARDOZO quotes authority to the effect that when the enforcement of a "license tax" is not left to the ordinary means devised for the collection of taxes that fact furnishes some proof that the tax is in fact, as well as in name, a license tax (citing cases). The fine and imprisonment which by this Oleomargarine Act of 1901 is inflicted as punishments on those who sell oleomargarine without a license or who otherwise violate any provisions of this act is additional proof that the act is a license act and not a mere tax on business or property.

Appellant's paper book contains a statement as follows:

"We argue most strongly that the age of the statute and the length of time during which oleomargarine fees have been collected, and the number of times the legislature has met without changing those fees clearly indi-

cates a legislative intent that the excess of fees over enforcement costs should be used by the Commonwealth for its general expenses. And furthermore, we think that the title of the oleomargarine laws should be interpreted in the light of age. For obviously when a law stands on the books as long as has the Act of 1901, it is presumed that the public never having questioned the title, has notice of its contents."

The answer to this argument is found in the opinion of this Court in *Kucker v. Sunlight Oil & G. Co.*, 230 Pa. 528, 533, where we said:

"While a court should hesitate to declare a statute unconstitutional until clearly satisfied of its invalidity, and where it has been on the statute books for many years the hesitation should be all the greater, yet, if such an act is plainly in conflict with the organic law of the state, old age cannot give it life, and when the issue of its constitutionality is properly raised, it must be declared void. We have never ruled to the contrary. In Com. v. Hazen, 207 Pa. 52, an act was declared unconstitutional after it had been on the books for thirty-two years, and in Orkney Street, 194 Pa. 425, after thirty-three years; and many other like instances could be cited."

During the argument before this court appellant's counsel stated that when the Act of 1901 was passed it may have required all the funds raised by the license fees to protect the public against fraud and deception in the manufacture and sale of oleomargarine as imitation butter, and that if such was the fact the Act would have been constitutional when passed and that it would be anomalous for courts to declare many years after an act had been passed that it had become unconstitutional by a change in the factual situation.

First of all, the record is barren of any proof that when the Act of 1901 was passed there was *no disproportion* between the amount raised by the prescribed license tax and the amount it required to effectuate the

Act's purposes and that, therefore, it was at that time a justifiable "police regulation". The presumption that this act, like all other acts of legislation, is constitutional means that the burden of proof is upon him who contends that the act is *un*constitutional. This burden the plaintiff met when it proved that from 1931 to 1946 the amount collected for licenses to sell oleomargarine was so far in excess of the amount required to enforce the regulations as to the sales of that product as to impose an oppressive and unwarranted restriction upon a lawful business. When a factual situation continues for fifteen years which reveals that an ostensible police regulation is not a police regulation but in practical operation a device to hamper or destroy a legitimate business, it becomes the duty of the judiciary to declare the act's true character and to decree that it is inoperative, even if the statute when it was first enacted was *in the situation then existing* a justifiable police regulation. When it ceased for a substantial period of time to be such a regulation it lost its aegis of constitutionality.

The reasonableness of a "police regulation" of any business depends chiefly on the circumstances on which the regulation operates. No police regulation should be allowed to "interfere with the enjoyment of individual rights beyond the necessities of the case": *Reduction Company v. Sanitary Works,* 199 U. S. 306, 318. "The measure of police power must square with the measure of public necessity. The public need is the pole-star of the enactment, interpretation and application of the law," per WANAMAKER, J., in *Leonard v. State,* 100 Ohio St. 456, 157 N. E. 464.

In *U. S. v. Carolene Products Co.,* 304 U. S. 144, at page 153, the Supreme Court of the United States in an opinion by Justice, later Chief Justice, STONE said: "The constitutionality of a statute predicated upon the existence of a particular state of facts may be challenged by showing to the court that those facts have ceased to exist." In *Chastleton Corporation et al. v. Sinclair et*

*al., Rent Commission of the District of Columbia, et al.,* 264 U. S. 543, Justice HOLMES, speaking for the Supreme Court, said: ". . . A law depending upon the existence of any emergency or other certain state of facts to uphold it may cease to operate if the emergency ceases or the facts change even though valid when passed." In *Perrin v. United States,* 232 U. S. 478, it was said that a prohibition by act of Congress against the sale of liquor on lands ceded by Indians to the United States within the limits of a State may become inoperative when all the Indians affected thereby become completely emancipated from Federal control.

See also as to the effect on the enforcement of a statute, of "a change in conditions" and as to the constitutionality of a "public regulation" of a business being "determined by the facts of each case", *Missouri v. Chicago, Burlington & Quincy Railroad Company,* 241 U. S. 533; *Knoxville v. Knoxville Water Co.,* 212 U. S. 1; and *Chas. Wolff Packing Co. v. Court of Industrial Relations of the State of Kansas,* 262 U. S. 522.

The tenor and purport of the act in question carries the clear implication that the money to be raised by it is necessary for the due enforcement of it as a police regulation essential to the protection of the public against a spurious food product. When in enacting a "police statute" the Legislature expressly declares or clearly implies that such a public purpose is the raison d'etre for the enactment, the latter's validity depends on the truth of what is so declared or implied, and it is for the courts to determine whether the justifying declaration or implication is well founded or unfounded.

No principle is more firmly established in the law of Pennsylvania than the principle that a revenue tax cannot be constitutionally imposed upon a business under the guise of a police regulation, and that if the amount of a "license fee" is grossly disproportionate to the sum required to pay the cost of the due regulation

of the business the "license fee" act will be struck down. The courts interfere with the discretion of the legislature in such matters only "where the regulations adopted are arbitrary, oppressive, or unreasonable.": Cooley's Constitutional Limitations, 8th ed., Vol. 2, p. 1228. The regulations in question when tested by this standard require judicial interference with the legislative act creating them.

We agree with the court below that the facts clearly prove that so much of section 2 of the act challenged, which imposes license fees of $500 upon wholesale dealers in oleomargarine and $100 upon retail dealers in oleomargarine, is unconstitutional and void.

The decree is affirmed at appellant's costs.