Otto Milk Company, Appellant, *v.*
Washington City et al.

Argued September 29, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

244

*Joseph S. D. Christof,* with him *Artemas C. Leslie, David I. McAlister* and *McCloskey, Best & Leslie,* for appellant.

*Ralph W. Peacock,* with him *Meyer Goldfarb,* City Solicitor, *A. L. Zeman, Robert L. Zeman* and *Zeman & Zeman,* for appellees.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 21, 1949:

This is an appeal from the decree of the court below denying plaintiff the full relief it sought.

The plaintiff is a Pennsylvania corporation domiciled in the City of Pittsburgh and engaged in the business of receiving, processing and distributing at wholesale, milk and derivates thereof, within a radius of fifty miles of that City. The defendant is a municipal corporation in the County of Washington.

The plaintiff has fully qualified to sell milk and kindred products under the laws of this Commonwealth, holds a permit issued by the State Secretary of Health authorizing it to sell pasteurized milk in Pennsylvania, is duly licensed by the Pennsylvania Milk Control Commission to transact business as a milk dealer under the provisions of the Milk Control Law, and holds a permit from the Board of Health of the City of Washington to sell certified, raw and pasteurized milk within that City's limits. The latter permit was issued pursuant to the provisions of the Milk Ordinance No. 57, adopted by the Council of the City of Washington on July 22, 1925,

which ordinance regulates the distribution of milk therein. Section 8, subsection 6 of the "Milk Ordinance" provides that " 'Pasteurized Milk' shall be delivered to the consumer in bottles only unless otherwise specified in the permit."

On April 11, 1947, the *Board of Health* of the City of Washington passed a resolution purportedly pursuant to the authority granted by the 1925 Milk Ordinance requiring that all milk and fluid derivates of milk except condensed and evaporated milk sold and delivered to houses or to stores for resale to customers must be bottled and delivered in transparent containers; and on July 1, 1947, passed another resolution providing that all milk sold in bottles must be capped by a mechanical capper and all milk caps must completely cover the pouring lip of the container.

Upon notification of the above resolutions plaintiff conferred with the Board of Health, and as a result of conference the Board passed a resolution on July 30, 1947, permitting all milk dealers to use the "Pure-Pak" single service container or a container of similar design for the distribution of milk and fluid derivates thereof. Prior to August 1, 1947, plaintiff had distributed milk exclusively in glass bottles. On this date plaintiff removed its machinery for packaging milk in glass bottles and substituted therefore machinery for packaging milk in Pure-Pak paper bottles, and began distribution. On August 2, 1947, plaintiff was notified that the resolution of July 30th had been revoked, and that the resolution of April 11th reinstated.

On August 4, 1947, plaintiff filed this bill in equity against the City of Washington, the Board of Health, the individual members of the Board, and other officials of the said City, seeking an injunction restraining defendants from enforcing the resolutions and regulations of the Board of Health passed on April 11, 1947, and August 1, 1947, and the ordinances of the City as appli-

cable thereto. A preliminary injunction immediately issued.[1] At the hearing on the continuance of the preliminary injunction held September 24, 1947, defendants' counsel conceded that the resolution of the Board of Health adopted April 11, 1947, and reënacted August 1, 1947, was invalid, because this resolution did not relate to the enforcement of the Milk Ordinance No. 57, but constituted changes in substance which were ultra vires so far as the Board was concerned. After hearing the court continued the preliminary injunction, but refused to enjoin defendants from enforcing the terms of the Milk Ordinance No. 57.

The defendants having been enjoined temporarily from enforcing the *resolution* as reënacted August 1, 1947, undertook to threaten the plaintiff with prosecution under the *Milk Ordinance* for use of *paper* bottles in the distribution of milk in the City of Washington. The Board of Health, through its secretary, by letter threatened plaintiff with prosecution and revocation of its health permit. Similar letters were sent to every store distributing and selling plaintiff's milk in the City. As a result of this action plaintiff's customers wholly refused to accept further deliveries of milk in paper bottles, and plaintiff thereafter delivered no milk in the City of Washington.

---

[1] Prior to the hearings, with the approval of the court, plaintiff filed a petition with the Milk Control Commission seeking an adjudication of the dispute. The Commission declined to take jurisdiction. Plaintiff then filed a petition with the Pennsylvania Department of Public Health seeking a ruling as to whether "Pure-Pak" paper containers meet the sanitary standards required by that Department for the distribution of milk in this State, and further requesting that an appropriate order, rule or regulation be promulgated by the Department of Public Health to that effect. The Secretary of Health by letter informed plaintiff that the Pure-Pak container met the standards required by that Department relating to sterile containers in which milk may be distributed and that these containers were acceptable.

Defendants in their answer filed October 6, 1947, averred that the Milk Ordinance No. 57 prohibited the sale and distribution of milk in "Pure-Pak paper containers or bottles," and that the plaintiff has sold and distributed milk in paper or fibre board containers without being capped as required.

On November 5, 1947, plaintiff filed an Amendment to its Bill in Equity, wherein it requested the court to issue an injunction restraining the defendants from interfering with plaintiff's lawful business of selling and distributing milk and fluid derivates thereof in "Pure-Pak fibre board bottles or containers", and restraining defendants from enforcing the Milk Ordinance contrary to its true intent and in such a manner as to prohibit or interfere with the use of "paper milk bottles"; and further restraining defendants from revoking plaintiff's health permit because of its sale and delivery of milk products in "paper milk bottles." No answer was filed by defendants, and after argument, the court on October 15, 1947, refused to issue the temporary injunction requested.

Final hearing was held on March 22, 1948, at which time the testimony taken at the hearing on September 24, 1947, was made a part of the record. The Chancellor in his Adjudication filed October 15, 1948, enjoined the defendants from enforcing the resolutions adopted by the Board of Health on April 11, 1947, as reënacted August 1, 1947, and July 1, 1947; but dismissed the bill insofar as it sought to enjoin and restrain defendants from enforcing the provisions of the 1925 Milk Ordinance. The Chancellor found, inter alia, these facts:

"Plaintiff uses a paper or fibre board container called a 'Pure-Pak' container which is made of fibre board, commonly called paper.

"The milk is packaged entirely by mechanical process, and the machine used is called a 'Pure-Pak'

machine. The whole operation is automatic and no human hands touch the container from the time it is supplied as a blank until it is placed in the case. Immediately before filling with milk the container in the 'Pure-Pak' machine is wholly immersed in paraffin.

"These containers are used once and never refilled.

"The 'Pure-Pak' containers used were found not to be 'subjected to moist heat or to moist heat and chemical treatment as referred to in the Milk Ordinance'; and no capper of any sort is used in closing this container, while the Milk Ordinance prohibited the sale of milk in 'bottles capped in any way other than by the use of an approved mechanical capper.'

"The 'Pure-Pak' containers are opaque which prevents purchasers from ascertaining whether the milk contains any visible dirt or other deleterious substances; control over the sterilization of milk containers is less effective than with the glass bottles; and the consumer's ability to discover foreign materials and dirt in glass containers is an aid to the Health Officers in enforcing the terms of the Milk Ordinance and also an aid to city control over sterilization."

The Chancellor also stated as a finding of fact that both the Secretary of Health of this Commonwealth and the United States Department of Public Health Service have *approved* the use of the paper container for the packaging and distribution of milk, and that the "Pure-Pak" container specifically has been approved by the Secretary of Health of Pennsylvania. However, the Chancellor concluded in the 27th finding of fact that the Pure-Pak containers are "not bottles as referred to in the 'Milk Ordinance' of the City of Washington."

The first question raised is whether the Pure-Pak container used by the plaintiff in delivering its milk is a "bottle"? If it is a bottle, the plaintiff is entitled to the injunction asked for restraining the City of Washington

and the appropriate officials from interfering with plaintiff's delivery of milk in those containers.

Since the defendants' threat of prosecution against the plaintiff is based entirely on plaintiff's delivery of milk in *Pure-Pak* fibre containers, it follows that if these containers are "bottles" plaintiff is entitled to the relief it seeks.

Words and phrases should be construed "according to rules of grammar and according to their common and approved usage": Statutory Construction Act of May 28, 1937, P. L. 1019, art. III, §33 (46 PS 533). According to approved usage this Pure-Pak fibre container is a bottle. Webster's New International Dictionary (2nd ed.) defines the word "bottle" as follows: "A hollow vessel of glass, earthenware, or the like, usually with a comparatively narrow neck or mouth, and without handles. Bottles of skins of animals, as of goats, sewn up in the form of a bag and tied at the neck, were used by the Hebrews, and are still in use, especially among the ruder peoples. Bottle is now so loosely used that its limit of application is not well defined; it is generally distinguished from such vessels as the jug and demijohn." The Century Dictionary and Encyclopedia (1911 Ed.) defines the word "bottle" as follows: "A hollow mouthed vessel of glass, wood, leather, or other material, for holding and carrying liquids."

In *Fieldcrest Dairies, Inc., v. City of Chicago et al.,* 35 F. Supp. 451 (D. C., Ill.), the United States District Court held that a "bottle" is not characterized by the material out of which it is made. Whether made of skins or glass or other hard substances, a bottle must have certain characteristics. It must be an open mouthed vessel; it must have a neck with an aperture which may be closed with a plug, string or a stopper; and it must be capable of containing liquids. The Court in its opinion stated, inter alia: "The record contains much evidence

as to the use of the paper containers in New York City, Philadelphia, Boston, Detroit, Cleveland, San Francisco and 480 other cities and villages, including many cities and villages and municipalities in Cook, Lake and DuP'age counties, Illinois. In these cities and municipalities the use of the paper container for the delivery of milk is recognized by ordinance, custom, usage and common acceptance as being a standard article in which milk may be delivered."

The fact that to most people nowadays the word "bottle" may convey the idea of a container made of glass is not decisive of the question before us. Bottles were among the first things used by primitive man. They were in common use long before men knew how to make glass bottles.[2] The identifying characteristics of any object are not its composition but its form and function. For centuries stockings were made of wool, cotton and silk. Now stockings are made from nylon, a synthetic material of recent creation. A dress may be

---

[2] "The invention of glass-blowing, which marked a turning-point in the history of glass [and facilitated the making of glass bottles], did not take place till about the beginning of the Christian era, in the time of the Emperor Augustus; and the place was the Phoenician city of Sidon": Encyclopaedia Britannica (14th ed.), Vol. 10, p. 400-401.

Vol. 3, Encycl. Brit., p. 952, defines a "bottle" as follows: "A vessel for containing liquids, generally as opposed to one for drinking from (though this probably is not excluded) and with a narrow neck to facilitate closing and pouring. The first bottles were probably made of the skins of animals. In the *Iliad* (iii. 247) the attendants are represented as bearing wine for use in a bottle made of goat's skin. The ancient Egyptians used skins for this purpose. . . . The Greeks and Romans also were accustomed to use bottles made of skins; and in the southern parts of Europe they are till used for the transport of wine. The first explicit reference to bottles of skin in Scripture occurs in Joshua (ix. 4), where it is said that Gibeonites took 'old sacks upon their asses, and wine-bottles old and rent and bound up'. . . . Skins are still most extensively used throughout western Asia for the conveyance and storage of water. . . ."

made of fine-spun glass instead of linen, cotton, wool or silk, but it is nevertheless a dress. A car wheel has long been made of steel or wood. It can be made from compressed paper and still be a wheel, for any disc or frame that is circular and pivots on its central axis is a wheel regardless of its composition.

The court below in its findings of fact emphasized that the Pure-Pak container used by plaintiff is *"opaque* which prevents the purchaser thereof from discovering whether the same contains visible dirt or other deleterious substances."[3] There is nothing in the Milk Ordinance which forbids milk being delivered in black, yellow, green, blue, red or amber bottles. The Ordinance places no restriction on the color of the bottle to be used.

It is obvious that the objection to the bottle used by plaintiff is based not on its capacity or its shape but on its composition. If the bottle used by plaintiff had been made of glass, no matter what the color of the glass, apparently there would not have been any interference with plaintiff's use thereof. If the City of Washington desired to restrict the delivery of milk to bottles which were transparent, it should have said so in its Ordinance.

Whether an ordinance requiring milk to be delivered in transparent containers would be a valid exercise of the police power, need not now be decided.[4] This Court

[3] See footnote 5 at the end of this opinion.

[4] If the city attempts by ordinance to prohibit the delivery of milk in Pure-Pak fibre board or paper containers, it will have to justify such a restriction on plaintiff's use of its own property by showing that the restriction it imposes is reasonable and essential to the public welfare. In attempting to jutify such a restriction it will be confronted with the facts (quoting from the lower court's findings in the instant case) that the Secretary of Health of the Commonwealth of Pennsylvania has approved the use of "Pure-Pak" containers for distribution of milk in Pennsylvania; and that the use of the paper container, which is also called the "single service container", is approved for the packaging and distributing of milk by the United States Department of Public Health Service.

in *Flynn et al. v. Horst,* 356 Pa. 20, 25, 51 A. 2d 54, quoting from an earlier opinion stated: " '. . . while it is for the legislature to determine in the first instance what laws and regulations are needed to carry out these ends, the courts may determine whether the regulations have some reasonable relation to those ends.' " We also there stated that: "The reasonableness of a 'police regulation' of any business depends chiefly on the circumstances on which the regulation operates. No police regulation should be allowed to 'interfere with the enjoyment of individual rights beyond the necessities of the case': Reduction Company v. Sanitary Works, 199 U. S. 306, 318." We quoted from the case of *Leonard v. State,* 100 Ohio St. 456, 157 N. E. 404, where Justice WANA-MAKER, speaking for the Supreme Court of Ohio said: "The measure of police power must square with the measure of public necessity. The public need is the pole-star of the enactment, interpretation and application of the law. . . ." We also quoted the following from *White's Appeal,* 287 Pa. 259, 134 A. 409: "While the tribunal to determine the proper exercise is in the first instance the legislature, the ultimate decision rests

---

In *Dean Milk Co. et al. v. City of Chicago et al.,* 53 N. E. 2d 612, 617, 385 Ill. 565, the Supreme Court of Illinois said inter alia: "Plaintiffs' evidence tends to establish that single service containers as used by them were just as sanitary as the 'standard milk bottles', and as a matter of fact were better adapted to protect the public against impure milk. Their proof shows that single service containers have, in recent years, been widely used in various cities; that no illness or disease has been traced to them, and that their use has been approved by the United States Public Health Service, the Chicago Board of Health, and the Illinois Department of Health." In that case the Illinois court held that the Chicago city ordinance which required milk sold in less than gallon quantities to be delivered in "standard milk bottles" excluded paper single service containers, and was a valid exercise of the city's police power. The use of the word "standard" in the Chicago ordinance distinguishes that case from the one before us.

with the courts. If after investigating there is doubt as to whether the statute is enacted for a recognized police object, or if, conceding its purpose, its exercise goes too far, it then becomes the judicial duty to declare the given exercise of the police power invalid (citing cases). 'The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations. In other words, its determination as to what is a proper exercise of its police power is not final or conclusive, but is subject to the supervision of the courts' " (citing cases).

Cooley in Vol. 2 of Constitutional Limitations (8th ed.) p. 1228-9 says: "The exercise of the [police] power for the public welfare may inconvenience individuals, increase their labor, and decrease the value of their property. It is a matter resting in the discretion of the legislature, and the courts will not interfere therewith except where the regulations adopted are arbitrary, oppressive, or unreasonable. Their wisdom or expediency cannot be subjected to judicial review. (Citing cases) But the power is subject to the limitations imposed by the Federal and State Constitutions upon every power of government, and it will not be suffered to invade or impair the fundamental liberties of the citizen."

No capper of any sort is used in closing the Pure-Pak containers. However, since the lower court found that this does not violate Subsection K of Section 2 of the Milk Ordinance which prohibits the delivery of "milk in bottles capped in any way other than by the use of an approved mechanical capper", the "capping" of the bottles need not be discussed.

The decree of the court below entered March 21, 1949, is amended by substituting for the second paragraph of this decree the following paragraph: "That

the defendants and their servants, agents and officers are hereby enjoined from enforcing the Milk Ordinance No. 57 of the City of Washington contrary to its true intent, meaning and purpose, and in such manner as to prohibit or interfere with the *use by plaintiff* in the sale and delivery of milk and the fluid derivatives thereof in the City of Washington, Pennsylvania, of the *'Pure-Pak'* *containers* which have been approved for use in the distribution of milk in Pennsylvania by the Secretary of Health of this Commonwealth. The defendants are further enjoined from revoking the Health Permit of the plaintiff because the plaintiff sells or delivers milk or milk products in paper milk bottles." As *thus amended* the decree is affirmed.

Costs to be paid by the appellee.[5]

---

[5] People consume many things which come in opaque containers. Much food is sold in tin cans. A milk *bottle* if devoid of color is transparent, but a bottle of *milk* is not. The fact that the beverage one is consuming is poured out of a bottle is no guarantee that the substance does not contain something deleterious. In *Rozumailski v. Philadelphia Coca-Cola Bottling Co.*, 296 Pa. 114, 145 A. 700, a patron of a restaurant purchased a bottle of Coca-Cola, drank it and was injured by some broken glass which he said was within the bottle. In *Nock v. Coca-Cola Bottling Works of Pittsburgh*, 102 Pa. Superior Ct. 515, 156 A. 537, a woman who purchased a bottle of Coca-Cola testified that after she had consumed a portion of its contents, she was conscious of a creeping sensation on her lips which proved to be due to a worm that had been in the bottle. In *Coralnick v. Abbotts Dairies, Inc.*, 337 Pa. 344, 11 A. 2d 143, a purchaser of a bottle of milk was injured while he was removing a bottle from the container to place it in his refrigerator when the bottle broke cutting his hand. See also *Dillon v. William S. Scull Co.*, 164 Pa. Superior Ct. 365.

It is of considerable significance that Section 12 of the Milk Ordinance specifically requires, under penalty, delivery of milk in paper containers to any house wherein a case of communicable disease exists. This is an implied recognition of the fact that in one respect at least the use of the "single service container milk bottle" protects the public health more effectively than does the use of a glass milk bottle.