STATE EX REL. STATE AERONAUTICS COMMISSION ET AL., RELATORS, *v.* BOARD OF EXAMINERS OF STATE ET AL., RESPONDENTS.

No. 8817.

Submitted March 17, 1948. Decided May 11, 1948.

194 Pac. (2d) 633.

404

Mr. Edwin K. Cheadle, of Helena, for relators. Mr. Cheadle argued the cause orally.

Mr. R. V. Bottomly, Atty. Gen., and Mr. Alfred F. Dougherty and Mr. M. Baxter Larson, Asst. Attys. Gen., for respondent. Mr. Dougherty and Mr. Larson argued the cause orally.

Mr. J. R. Wine, Jr., and Mr. Victor H. Fall, both of Helena, amici curiae. Mr. Wine argued the cause orally.

MR. JUSTICE ANGSTMAN delivered the opinion of the court.

This is an original proceeding in this court in mandamus.

The petition alleges that claims for expenses of relators in administering the provisions of Chapter 152, Laws 1945, have been approved and paid by defendants to and including the month of November 1947, but that they refuse to approve and pay claims for expenses incurred since that time. The refusal is based upon the fact that the Thirtieth Legislative Assembly failed to make any appropriation for that purpose for the fiscal years 1947-1948 and 1948-1949.

Relators contend that the expenses in question are payable from a special fund provided for that purpose and that the constitutional provisions relating to appropriations and particularly that part of section 12, Article XII prohibiting appropriations of public moneys for a longer term than two years have no application.

Section 20 of Chapter 152 provides that all costs and expenses of administering the act shall be paid out of the state aviation fund. It provides that the aviation fund shall be made up of the following revenues:

"All gifts and all legislative appropriations for said fund; all moneys received from any branch or department of the federal government, or from other sources, for the purposes mentioned in this act or for the furtherance of aeronautics generally in this state.

"There shall also be paid into said fund the proceeds of one cent per gallon out of each five cents per gallon of gasoline license tax now imposed by the laws of Montana upon purchases of gasoline used for the operation of aircraft.

"The revenue from said one cent per gallon of said tax shall no longer be placed in either the state highway fund or the gasoline license drawback fund as now required by Sec. 2381.22, R. C. M. 1935, as amended, but the same shall, when received by the state treasurer, be placed in the state aviation fund.

"No part of said one cent per gallon of gasoline license tax imposed by the laws of Montana on gasoline purchased and used for the operation of aeroplanes or aircraft, shall be sub-

ject to refund under the provisions of Sec. 2396.4, R. C. M. 1935 as amended, it being the intent of this section to reduce from five cents to four cents per gallon the amount of gasoline license tax which may be refunded on purchases of gasoline used in the operation of aircraft, and to leave otherwise unchanged the provisions of said section 2396.4.''

By section 8 of the act the aeronautics commission is authorized to accept federal and other moneys either public or private.

By subdivision (d) of section 8, it is provided:

''(d) Disposition of federal funds—All monies accepted for disbursement by the commission pursuant to subdivision of this section shall be deposited in the state treasury, and, unless otherwise prescribed by the authority from which the money is received, kept in separate funds, designated according to the purposes for which the monies were made available, and held by the state in trust for such purposes. All such monies are hereby appropriated for the purposes for which the same were made available, to be expended in accordance with federal laws and regulations and with this act. The commission is authorized, whether acting for this state or as the agent of any of its municipalities, or when requested by the United States government or any agency or department thereof, to disburse such monies for the designated purposes, but this shall not preclude any other authorized method of disbursement.''

The constitutional provisions relied upon by respondents are section 34 of Article V, reading: ''No money shall be paid out of the treasury except upon appropriations made by law, and on warrant drawn by the proper officer in pursuance thereof, except interest on the public debt,'' section 10 of Article XII reading: ''All taxes levied for state purposes shall be paid into the state treasury, and no money shall be drawn from the treasury but in pursuance of specific appropriations made by law,'' and the following part of section 12, Article

XII: "No appropriation of public moneys shall be made for a longer term than two years."

We are not advised as to whether the aviation fund on hand contains any federal moneys or any other moneys save that derived from the one cent per gallon tax on gasoline. The parties have argued the questions presented as if the only moneys in the aviation fund were those derived from the gasoline tax and we shall consider the questions from that standpoint. We may say in passing however that federal funds and other moneys derived otherwise than by taxation never reach the general fund of the state treasury and hence require no legislative appropriation other than that already made by subdivision (d) of section 8 above quoted.

As to the gasoline license tax of one cent per gallon, it is contended by respondents that it is a tax for a state purpose and hence section 10 of Article XII requires that it be paid into the state treasury and that it can be taken out only by an appropriation every two years.

Section 10 of Article XII and other constitutional provisions ██ relating to taxation have no application to license fees or taxes imposed for regulatory purposes as distinguished from property taxes. In State ex rel. Attorney General v. Wisconson Constructors, 222 Wis. 279, 268 N. W. 238, 243, the court made this point clear by saying:

"Taxes are imposed for the purpose of general revenue. Licenses and other fees are ordinarily imposed to cover the cost and expense of supervision or regulation. City of Milwaukee v. Milwaukee Electric R. & Light Co., 147 Wis. 458, 133 N. W. 593, 595. See, also, Head Money Cases, 112 U. S. 580, 5 S. Ct. 247, 28 L. Ed. 798; United States v. Butler (AAA decision), 297 U. S. 1, 56 S. Ct. 312, 80 L. Ed. 477, 102 A. L. R. 914. The distinction between a tax and an imposition under the police powers is well stated in Cooley on Taxation (4th Ed.) pp. 3511, 3513, 3528:

" 'The distinction between a demand of money under the police power and one made under the power to tax is not so

much one of form as of substance. The proceedings may be the same in the two cases, though the purpose is essentially different. The one is made for regulation and the other for revenue. If the purpose is regulation the imposition ordinarily is an exercise of the police power, while if the purpose is revenue the imposition is an exercise of the taxing power and is a tax. If, therefore, the purpose is evident in any particular instance, there can be no difficulty in classifying the case and referring it to the proper power. * * *

" 'Only those cases where regulation is the primary power can be specially referred to the police power. If revenue is the primary purpose and regulation is merely incidental the imposition is a tax; while if regulation is the primary purpose the mere fact that incidentally a revenue is also obtained does not make the imposition a tax, although if the imposition clearly and materially exceeds the cost of regulation, inspection or police control, it is generally held to be a tax or an illegal exercise of the police power. * * *

" 'The power of a state to require a license fee in the exercise of the police power is inherent, subject to the limitations upon the police power in general and to any constitutional limitations which may exist; but constitutional limitations on the power to tax have no application'—citing State v. Anderson, 144 Tenn. 564, 234 S. W. 768, 19 A. L. R. 180.''

The same question was considered in Stewart v. Verde River Irr. & Power Dist., 49 Ariz. 531, 68 Pac. (2d) 329, and the same conclusion reached. And to the same effect see Parsons v. People, 32 Colo. 221, 76 Pac. 666.

This court reached the same conclusion in State v. Police ▮▮ Court, 68 Mont. 435, 219 Pac. 810. And this court held in State ex rel. Sam Toi v. French, 17 Mont. 54, 41 Pac. 1078, 30 L. R. A. 415, that a license fee is not a tax subject to the uniformity clause of the Constitution. To the same effect is State ex rel. Griffin v. Greene, 104 Mont. 460, 67 Pac. (2d). 995, 111 A. L. R. 770. It is sometimes difficult to ascertain whether a given exaction is a revenue or a regulatory measure. But in

this case there can be no doubt on the subject. Chapter 152 is a regulatory measure. It provides for the licensing of all persons operating in aviation. Sec. 9, Title III. The commission is empowered to assist in the development of aeronautics in this state and to encourage the establishment of airports. It may make rules and regulations, establish minimum standards for the purpose of protecting and insuring public safety.

In 33 Am. Jur., page 338, it is said, ''nor are statutory or constitutional restrictions upon the power to tax applicable to license fees required for the purpose of regulation.'' And again on page 340 it is said: ''The fact that a pecuniary amount is charged and that revenue may result from the enforcement of license requirements does not necessarily mean that the license enactment is a revenue measure. Revenue may result from an undisputed exercise of the police power, which revenue is designed to defray the cost of regulation of the business or occupation for which it is exacted, but that fact does not divest the regulation of its police character and render it an exercise of the taxing power, nor in any proper sense may such an imposition be considered a tax.'' But respondents rely upon the case of State ex rel. Diederichs v. State Highway Comm., 89 Mont. 205, 296 Pac. 1033, as sustaining the contention that the motor fuel excise tax is a revenue measure. That case so holds. Likewise the Supreme Court of Utah has held that a four cent per gallon tax on the use of diesel motor fuel is a revenue measure. Garrett Freight Lines v. State Tax Comm., 103 Utah 390, 135 Pac. (2d) 523, 146 A. L. R. 1003. The tax is generally referred to as an excise tax. See cases cited in note in 84 A. L. R. 866.

Our law imposing the five cent per gallon gasoline tax makes no pretense at regulation. It specifically provides that the proceeds are to be used for the construction and maintenance of highways. But the Act in question here takes one cent per gallon of the gasoline license tax, which were it not for this Act, would be refunded to the aviation operator using the gasoline otherwise than on the highways of the state.

The practical operation of Chapter 152 places the burden of ▉ paying the one cent per gallon tax on the user of the gasoline for aviation purposes (compare Gregg Dyeing Co. v. Query, 286 U. S. 472, 52 S. Ct. 631, 76 L. Ed. 1232, 84 A. L. R. 831, 837) and it is used to regulate the aviation operators and hence is clearly a regulatory and not a revenue measure, and as such it is not subject to the constitutional provisions relating to taxation.

Section 10 of Article XII has no application to the license ▉ tax in question here, and in consequence it is not necessary that the proceeds of the one cent per gallon gasoline tax be paid into the state treasury as a part of the general fund of the state and it was competent for the legislature to provide as it did in Chapter 152 that the moneys be kept in a separate fund, known as the state aviation fund.

It is not a new thing in Montana for the legislature to place license fees in a special fund for a special purpose. Prior to the passage of Chapter 14, Laws of 1941, many license fees were paid into special funds for special purposes. By Chapter 14 most of them are now required to be paid into the general fund of the state.

Is this fund subject to the provisions of section 12, Article ▉ XII of the Constitution to the effect that "no appropriation of public moneys shall be made for a longer term than two years" and to the provisions of section 10, Article XII that "no money shall be drawn from the treasury but in pursuance of specific appropriations made by law" and to the similar provision in section 34 of Article V. This court has repeatedly held that these sections of the Constitution have no application to special or trust funds which have never been placed in the general funds of the state. State ex rel. Veeder v. State Board of Education, 97 Mont. 121, 33 Pac. (2d) 516; State ex rel. Blume v. State Board of Education, 97 Mont. 371, 34 Pac. (2d) 515; State ex rel. Hawkins v. State Board of Examiners, 97 Mont. 441, 35 Pac. (2d) 116; Barbour v. State Board of Education, 92 Mont. 321, 13 Pac. (2d) 225; State ex rel. City of Missoula

v. Holmes, 100 Mont. 256, 47 Pac. (2d) 624, 100 A. L. R. 581; Martin v. State Highway Comm., 107 Mont. 603, 88 Pac. (2d) 41.

In the Holmes case, supra, 100 Mont. at page 290, 47 Pac. (2d) at page 636, 100 A. L. R. 581, we said: "It is urged that the provisions of section 34 of article V of the Constitution are violated, in that money is directed to be expended from the treasury without any appropriation made therefor by law. The insurance fund is a special fund created by authority of law for a specific purpose. In the case of State ex rel. Veeder v. State Board of Education, 97 Mont. 121, 33 Pac. (2d) 516, 521, it was said: 'As the Act has to do only with special funds to arise from the operations authorized and in connection therewith and devoted to a special purpose, it does not violate the provisions of sections 34 and 39 of article V, or section 10 of article XII, of the Constitution, respecting state moneys and the appropriation thereof.' " And in State ex rel. Boorman v. State Board of Land Commissioners, 109 Mont. 127, 94 Pac. (2d) 201, 204, this court quoted with approval from the case of State ex rel. Bonner v. Dixon, 59 Mont. 58, 76, 195 Pac. 841, 844, the following: "Generally, the word 'appropriation' as used throughout our Constitution, has reference exclusively to the general fund."

Other courts with similar constitutional provisions have reached the same conclusion. Thus in the case of State ex rel. Boynton v. Kansas State Highway Comm., 139 Kan. 391, 32 Pac. (2d) 493, 495, the court had before it the question whether section 24 of Article 2 of the Kansas Constitution, which provided that "no money shall be drawn from the treasury, except in pursuance of a specific appropriation made by law, and no appropriation shall be for a longer term than two years," was violated by a certain legislative act of the state of Kansas. The court in holding that the act was not in contravention of section 24, Article 2, said: "Article 2, section 24, of our Constitution applies only to moneys that find their way into the state treasury. When our people, by amending article 11, section 8, of our Constitution, making two sections of it— 8 and 9 (as renumbered 9 and 10)—so that the state could

construct and maintain a state system of highways and levy special taxes on motor vehicles and motor fuels for that purpose, they made no specific provision that the moneys so raised and used should necessarily find their way into the state treasury, but left the Legislature free to provide for the collection and disbursement of such funds in the way it deemed best. What the Legislature did was to provide that these moneys, as collected, should be transmitted to the state treasurer and by him placed in the highway fund and disbursed on proper orders by the highway commission. Sections 17, 18, c. 225, Laws 1929, as amended by Laws 1933, c. 241, now R. S. Supp. 1933, 68-416, 68-417. Since these funds are not required by the Constitution to find their way into the state treasury, and by statute do not do so, article 2, section 24, requiring appropriation of moneys from the state treasury, has no application. These funds are collected for a specific purpose. The Legislature would have no authority to appropriate them for other purposes. They are collected, segregated, set aside, and can be used for one purpose only, namely, the construction and maintenance of state highways. This is not the only fund the state has, which, although deposited with the state treasurer and disbursed by him under proper directions of other officials, does not find its way into the state treasury, and therefore does not require specific appropriation every two years by the Legislature.''

This court cited and quoted from the Boynton case with approval in the Boorman case, supra. To the same effect as the Boynton case is the case of Kittredge v. Boyd, 136 Kan. 691, 18 Pac. (2d) 563, 568, 93 A. L. R. 574.

In Louisiana State Dept. of Agriculture v. Sibille, 207 La. 877, 22 So. (2d) 202, 205, the court had before it a license tax on the shipment of sweet potatoes of one cent per bushel for a certain period and two cents a bushel thereafter. It was attacked on several constitutional grounds. Among other contentions it was argued that the act violated the constitutional command that ''all taxes shall be uniform upon the same class

of subjects." Of this contention the court said: "under our well-established jurisprudence those constitutional provisions apply only to property taxes; they do not control the imposing of license or excise taxes." It was also attacked upon the grounds that it violated constitutional provisions prohibiting money to be drawn from the treasury except in pursuance of specific appropriation made by law and prohibiting appropriations of money for a longer term than two years. Of these contentions the court said: "Appellees' fourth complaint, listed in Paragraph (d) of their plea, is that the statute violates Article 4, Section 1 of the Louisiana Constitution, by providing for the disbursement of public money from the State Treasury without any specific appropriation and by undertaking to distribute the proceeds of the tax for a longer period than two years. The referred to constitutional provision reads in part: 'No money shall be drawn from the treasury except in pursuance of specific appropriation made by law; nor shall any appropriation of money be made for a longer term than two years.' According to Section 6 of the statute, the proceeds of the tax must be deposited in a special fund and all used by the Louisiana Sweet Potato Advertising Agency in conducting its publicizing and promotion campaign. By this method there is created a dedication, not an appropriation, and the mentioned constitutional provision is not violated. Board of Administrators of Charity Hospital v. Richhart, 139 La. 446, 71 So. 735; State ex rel. Porterie v. Charity Hospital of Louisiana, 182 La. 268, 161 So. 606."

The case of Commonwealth v. Powell, 249 Pa. 144, 94 A. 746, 749, treated of this question but under somewhat different constitutional provisions. In that state there is no prohibition against appropriations for more than two years, but what the court had to say on the question of appropriations has application here. It said: "* * * this provision of the Constitution was only intended to apply to biennial appropriations made by the Legislature out of the general revenues of the commonwealth. It has no application to a fund created for

a special purpose and dedicated by the act under which such fund is to be created to a particular use. The appropriation of the fund so created continues as long as the act which dedicates it to a particular use remains in force. * * * The statute does not provide that the money derived from the registration and license fees shall be paid into the state treasury generally, so as to become part of the general resources of the commonwealth. The state treasury is merely made a depository for such fees. * * * When a fund is thus created and dedicated to a particular use by an act of assembly, which provides for its safe-keeping and prescribes how it shall be made available, no further legislation is needed to make the act effective.'' Other analogous cases are: State v. Brian, 84 Neb. 30, 120 N. W. 916; State v. Hall, 99 Neb. 89, 155 N. W. 228, 156 N. W. 16; Edwards v. Childers, 102 Okl. 158, 228 Pac. 472; and State ex rel. Nelson v. Ivorson, 125 Minn. 67, 145 N. W. 607.

Respondents rely upon the following Arkansas cases as sustaining the opposite view: Moore v. Alexander, 85 Ark. 171, 107 S. W. 395; Dickinson v. Clibourn, 125 Ark. 101, 187 S. W. 909; Lund v. Dickinson, 126 Ark. 243, 190 S. W. 428. The Moore case involved revenues produced by an ad valorem tax on property and hence is distinguishable from the instant case. The Clibourn case supports respondents' contention under facts analogous to those here, but the opinion was by a divided court (two of the justices dissenting) and the conclusion is contrary to the trend of the Montana decisions above cited. The Lund case simply followed the Clibourn case.

But if an appropriation be necessary, it is apparent to us that the legislature actually did make an appropriation. It made the following appropriation for the first year of the biennium in question: ''From the Gasoline Drawback Fund. For gasoline drawbacks, including refunds to the federal government, as much as may be necessary to comply with the provisions of the law.'' Session Laws 1947, p. 761.

A like appropriation was made for the second year of the biennium. Id., p. 776.

The gasoline drawback fund is made up of 25 per cent of all moneys received by the state treasurer for gasoline license taxes. Sec. 2381.22. While under section 20 of Chapter 152, Laws of 1945, the 1 cent per gallon tax on gasoline used in aviation is no longer permanently placed in the drawback fund, yet of necessity and in the administration of the act it is temporarily placed therein until such time as it is ascertained how much gasoline on which the five cent per gallon tax was paid was used in aviation. As a practical matter the 25 per cent of all gasoline license taxes is first placed in the drawback fund under section 2381.22 and when applications for refunds are made and it is shown that a certain number of gallons of gasoline were used in aviation then a refund of four cents per gallon is made to the user and a transfer of one cent per gallon is made to the aviation fund from the drawback fund.

The legislature evidently had this operation in mind when it appropriated as much from the gasoline drawback fund "as may be necessary to comply with the provisions of the law." By provisions of the law was certainly meant all provisions of the law, one of which is that one cent per gallon of gasoline tax on gasoline used in aviation shall be transferred to the aviation fund and used in administering Chapter 152, Laws of 1945.

One other point, though not deemed of sufficient importance to be raised by counsel for either party, but relied upon in one of the dissenting opinions, should be considered. Does the amendment to section 2396.4 as amended by Chapter 67, Laws 1939 (the refund statute) made by Chapter 130, Laws 1947, affect the question before us?

Section 20 of Chapter 152, Laws of 1945, had the effect of taking 1 cent per gallon of the five cent per gallon license tax on gasoline used in aviation which otherwise would be refunded and applied it to the aviation fund. It is a special statute withdrawing one cent per gallon from the gasoline li-

cense tax of five cents per gallon which, were it not for Chapter 152, would be refunded to the user of the gasoline.

Chapter 130, Laws of 1947, is simply a re-enactment of section 2396.4 as amended with the added paragraph reading: ''All of the subdivisions of the state mentioned herein shall be subject to all of the conditions, rules and regulations applicable to individuals and as such subdivisions can act only by their officers and agents in presenting claims for refund they shall be responsible for and bound by the acts and declarations of such officers and agents.''

That amendment was made to change the rule announced in Roosevelt County v. State Board of Equalization, Mont., 162 Pac. (2d) 887.

It is plain that the legislature had no intention of making any other change in section 2396.4, as amended by Chapter 67, Laws of 1939, or of making any change in Chapter 152, Laws 1945.

The portions of section 2396.4 as amended by Chapter 67, Laws of 1939, which were unchanged by Chapter 130, Laws 1947, must be considered as having been the law from the time they were first enacted. This is by virtue of section 93, Revised Codes of 1935, reading: ''Where a section or a part of a statute is amended, it is not to be considered as having been repealed and re-enacted in the amended form, but the portions which are not altered are to be considered as having been the law from the time when they were enacted, and the new provisions are to be considered as having been enacted at the time of the amendment.''

And see Snidow v. Montana Home for the Aged, 88 Mont. 337, 292 Pac. 722, and State v. Yale Oil Corp. of South Dakota, 88 Mont. 506, 295 Pac. 255.

Hence Chapter 130, Laws of 1947, did not have the effect of changing the law as stated in Chapter 67, Laws of 1939, and as stated in Chapter 152, Laws of 1945, which simply took 1 cent per gallon of the gasoline license tax on gasoline used

in aviation, which otherwise would be refunded and applied it to the aviation fund.

Chapter 152 applies also to Chapter 130, Laws of 1947, because it is no different from Chapter 67, Laws 1939, except as to the added paragraph above quoted which has nothing to do with questions presented in this case.

"* * * it is a canon of statutory construction that a later statute general in its terms and not expressly repealing a prior special or specific statute, will be considered as not intended to affect the special or specific provisions of the earlier statute, unless the intention to effect the repeal is clearly manifested or unavoidably implied by the irreconcilability of the continued operation of both, or unless there is something in the general law or in the course of legislation upon its subject matter that makes it manifest that the legislature contemplated and intended a repeal." 50 Am. Jur. p. 566, 567.

Here the legislative intent to do nothing more than change the rule in the Roosevelt County case is so apparent that plausible argument on the point to the contrary is foreclosed. Had it thought for a moment that it was raising the refund from four cents per gallon to five cents the words "five cents" would have been italicized in Chapter 130, Laws of 1947, as was the quoted paragraph above. It is noteworthy that Chapter 130, Laws of 1947, was approved on February 28, 1947, and by its own terms became effective on that day and it was administered in accordance with the views herein stated until in November 1947 and we think correctly so.

It is our conclusion that the writ applied for by relators should be granted. It is so ordered.

Associate Justices Choate and Gibson, concur.

MR. CHIEF JUSTICE ADAIR (dissenting):

This is an original proceeding against five of the seven constitutional officers comprising the executive department of the state of Montana seeking a writ of mandate to compel the performance of acts which relator contends the law specially enjoins as a duty resulting from their respective offices.

To obtain the aid of this court by mandamus the relator must establish a clear legal right in itself to the relief prayed for and a violation of duty upon the part of the officers sought to be coerced. State ex rel. Grant v. Eaton, 114 Mont. 199, 133 Pac. (2d) 588; State ex rel. Cutts v. Hart, 56 Mont. 571, 578, 185 Pac. 769, 771, 7 A. L. R. 1678; sec. 9848, Rev. Codes, 1935.

The facts in the case are simple. The law applicable to such facts is plain.

The state aeronautics commission was created by an act of the 1945 legislative assembly. Chapter 152, Laws of 1945. It, like the state railroad commission and the state highway commission, is an administrative agency of the state supported and maintained by revenues provided by the legislative assembly.

The chief source of revenue provided for the support and maintenance of the state aeronautics commission was "the proceeds of one cent per gallon out of each five cents per gallon of gasoline license tax now imposed by the laws of Montana upon purchases of gasoline used for the operation of aircraft." Ch. 152, Laws of 1945, sec. 20, p. 346.

The act which created the state aeronautics commission also created the state aviation fund and specifically provides that out of such fund shall be paid all costs and expenses of administering the act, including the salary of employees and assistants, the expenses of members of the commission and all other disbursements necessary to carry out the purposes of the act.

The tax imposed by the laws of Montana upon the purchase of gasoline used for the operation of aircraft is levied and collected for state or public purposes only and must therefore be paid into the state treasury. Secs. 10 and 11, Art. XII, Constitution of Montana.

Since March 1, 1945, the date of the approval of the act creating the state aeronautics commission, more than $87,000 levied and collected as a gasoline tax upon purchases of gasoline used for the operation of aircraft has been paid into the

state treasury of the state of Montana and credited to the state aviation fund. During this time less than $1,100 has been paid into the state aviation fund from the proceeds of fees collected for the registration and licensing of aircraft and pilots and any and all other sources combined. No gifts have been received nor have any moneys been received from any branch or department of the federal government for deposit in said fund.

Claims totaling $9,401.98 for costs and expenses of the state aeronautics commission incurred in administering the act (Ch. 152, Laws 1945) for the month of December 1947 and succeeding months were presented to the state board of examiners of the state of Montana for examination.

The law of this state requires certain formalities and procedure before money may be withdrawn from the state treasury and paid out on claims against the state.

(1) The claims properly certified must first be presented to, examined and "duly approved by the state board of examiners" (sec. 193, Rev. Codes 1935) upon which board has been conferred the "power to examine all claims against the state; except salaries or compensation of officers fixed by law." Const. Mont. Art. VII, sec. 20.

(2) In examining the claims the state board of examiners ascertains whether or not there is an "unexhausted appropriation therefor made by the legislative assembly" (sec. 193, Rev. Codes 1935) from which said claims may be paid and if it finds that there is such an appropriation and that the claims are in proper form, correct, just and valid, they are approved and allowed by the board.

(3) After approval of the claims by the state board of examiners the next step is the presentation thereof to the state auditor for the issuance of state warrants upon the state treasurer for the payment of the claims. But "the state auditor shall not issue his warrant upon the state treasurer save by virtue of unexhausted appropriation therefor made by the legislative assembly, and after the presentation to him of a

claim duly approved by the state board of examiners, save and except for salaries and compensation of officers fixed by law." Sec. 193, Rev. Codes 1935. The rule expressio unius est exclusio alterius applies.

(4) Section 151, Rev. Codes, 1935, prescribes the duties of the state auditor and subdivision 17 thereof provides that, "no warrant must be drawn unless authorized by law, and upon an unexhausted specific appropriation provided by law to meet the same. Every warrant must be drawn upon the fund out of which it is payable, and specify the service for which it is drawn, when the liability accrued, and the specific appropriation applicable to the payment thereof."

(5) No moneys received by the state treasurer shall be paid out by him except upon state warrant issued by the state auditor. Sec. 193, Rev. Codes. See also Const. of Mont., Art. V, sec. 34 and Art. XII, sections 10 and 12.

Section 174, Rev. Codes, 1935, in part provides: "It is the duty of the state treasurer: * * * 3. To deliver to each person paying money into the treasury and to the state auditor a duplicate receipt showing the amount, *the sources from which the money accrued, and the funds into which it is paid,* which receipts must be numbered in order, beginning with number one at the commencement of each fiscal year. 4. To pay warrants drawn by the state auditor out of the funds upon and in the order in which they are drawn * * * 7. To keep separate accounts of the different funds. 8. To report to the state auditor, on the last day of each month, the amount disbursed * * * in payment of warrants during the month; which report must show the date and number of such * * * warrants, the fund out of which they were paid, and the balance of cash on hand in the treasury to the credit of each fund." (Emphasis supplied.)

Upon examining the claims the state board of examiners found that the 30th legislative assembly (1947) wholly failed to make any appropriation whatever of any of the moneys in the state aviation fund on which the proposed warrants are to

be drawn. No moneys having been appropriated for the payment of claims against the state aviation fund for the fiscal years 1947-1948 and 1948-1949, the state board of examiners refused to approve or allow the claims so presented.

The Constitution of Montana provides:

"No money shall be paid out of the treasury except upon appropriations made by law, and on warrant drawn by the proper officer in pursuance thereof, except interest on the public debt." Art. V, sec. 34.

"* * * no money shall be drawn from the treasury but in pursuance of specific appropriations made by law," Art. XII, sec. 10.

"No appropriation of public moneys shall be made for a longer term than two years." Art. XII, sec. 12.

"The provisions of this constitution are mandatory and prohibitory, unless by express words they are declared to be otherwise." Art. III, sec. 29.

Obedient to the above prohibitory provisions of the Constitution forbidding the drawing from or the paying out of the state treasury of money except upon appropriations made by law, the state board of examiners declined to approve the claims.

The withholding of the board's approval of the claims completely tied the hands of both the state auditor and the state treasurer, for the law does not permit the state auditor to issue his warrant upon the state treasurer until "after the presentation to him of a claim duly approved by the state board of examiners." (Sec. 193, Rev. Codes) and it does not permit the state treasurer to pay any money out of the state treasury except upon state warrants issued by the state auditor and upon appropriations made by law. Sec. 193, Rev. Codes: Const. Mont., Art. V, sec. 34; Art. XII, sec. 10, supra.

Since the relator's petition states that the state board of examiners "has failed, refused and neglected to approve" the claims submitted to it and "has withheld its approval of said claims," it shows on its face that relator is entitled to no re-

lief whatever as against either the state treasurer or the state auditor. Neither of these officers has violated any duty owing to relator for under the facts averred each of said officers is forbidden by express provisions of the law from acting in the absence of approval of the claims by the state board of examiners. Under such facts the writ should be quashed and the proceedings dismissed as to the state treasurer and the state auditor. Sec. 9848; sec. 193; subd. 17, sec. 151, Rev. Codes; Const. Mont., Art. V, sec. 34; Art. XII, sec. 10; Reeside v. Walker, 11 How., U. S., 272, 13 L. Ed. 693; State v. Kenney, 9 Mont. 389, at pages 395, 396, 24 Pac. 96.

The next question is: Did Sam C. Ford, governor of Montana, R. V. Bottomly, attorney general of Montana, and Sam W. Mitchell, secretary of state of Montana, as members of and constituting the board of examiners of the state of Montana, fail to perform the duties which the law specifically enjoins upon them when they refused to approve relator's claims?

The executive department of this state consists of the governor, lieutenant governor, secretary of state, atttorney general, state treasurer, state auditor and superintendent of public instruction. Constitution of Montana, Article VII, sec. 1.

The supreme executive power of this state is vested in the governor whose duty it is to see that the laws are faithfully executed. Const. Mont. Art. VII, sec. 5. The respondent governor of this state is able and learned in the law. He formerly served the state well and faithfully as its attorney general and later as one of the justices of this court. The respondent attorney general likewise is able and learned in the law, and for more than 32 years, has been a member of the bar of this court actively engaged in the practice of law in the state. The respondent secretary of state is a most intelligent, capable, conscientious and experienced state officer who is now completing his sixteenth consecutive year in his present office. Before entering upon the duties of their respective officers each member of the state board of examiners was required to take and subscribe to the constitutional oath to support, protect and defend the Constitution of

the state of Montana and to discharge the duties of their respective offices with fidelity. Const. Mont. Art XIX, sec. 1.

The interpretation which these public officers placed upon the above prohibitory provisions of the Constitution and Codes is entitled to great weight and respect. These learned executive officers read and interpreted the plain language of the Constitution and statutes as I interpret them, which is that, "no money shall be paid out of the treasury except upon appropriations made by law" (Art. V, sec. 34); "no money shall be drawn from the treasury but in pursuance of specific appropriations made by law" (Art. XII, sec. 10) and "no appropriation of public money shall be made for a longer term than two years" (Art. XII, sec. 12).

The 29th legislative assembly (1945) was prohibited from making any appropriation of public moneys for any purpose beyond the fiscal year 1946-1947 and the 30th legislative assembly (1947) made no appropriation whatever of any moneys in the state aviation fund for the fiscal years 1947-1948 and 1948-1949.

Under such facts it became and was the duty, under the law, of the governor, attorney general and secretary of state, acting as the state board of examiners, to withhold approval of relator's claims and it is now the duty of the justices of this court, who are likewise bound to support, protect and defend the Constitution, to uphold the aforesaid executive officers when so faithfully discharging their duties in obedience to the plain and express provisions of the fundamental law of the state.

The necessary revenue for the support and maintenance of the state shall be provided by the legislative assembly. Const. Mont. Art. XII, sec. 1.

The framers of the Constitution provided two methods of raising such revenue: State ex rel. Diederichs v. State Highway Comm., 89 Mont. 205, 211, 296 Pac. 1033; State v. Camp Sing, 18 Mont. 128, 44 Pac. 516, 32 L. R. A. 635, 56 Am. St. Rep. 551.

Section 1 of Article XII of the Constitution, after authorizing the taxation of property, provides: "The legislative assembly

may also impose a license tax, both upon persons and corporations doing business in the state."

The original gasoline license tax statute, Ch. 156, Laws 1921, as amended by Chapter 150, Laws of 1923, was construed by this court in State v. Sunburst Refining Co., 73 Mont. 68, 77, 235 Pac. 428, 429, where it is said: "This statute is not in any sense a police regulation. It imposes an excise or occupation tax solely for raising revenue and was doubtless intended to be that form of license tax mentioned in and authorized by the last sentence of section 1, Article XII, of our state Constitution."

Section 2381.5, Revised Codes 1935, designates the tax as "an excise or license tax," while section 10 of Chapter 39, Laws of 1945, designates the tax as "a license tax for the privilege of engaging in and carrying on * * * business in this state."

The following cases recognize the tax on gasoline to be an excise tax on the sale or use and not to be a property tax: State v. Silver Bow Refining Co., 78 Mont. 1, 252 Pac. 301; Pierce Oil Corporation v. Hopkins, 8 Cir., 282 F. 253; Garrett Freight Lines v. State Tax Commission, 103 Utah 390, 135 Pac. (2d) 523, 146 A. L. R. 1003; Crockett v. Salt Lake County, 72 Utah 337, 270 Pac. 142, 60 A. L. R. 867; Department of State Highways v. Baker, 69 N. D. 702, 290 N. W. 257, 129 A. L. R. 925; O'Berry v. Mecklenburg County, 198 N. C. 357, 151 S. E. 880, 67 A. L. R. 1304; State v. City of Monroe, 177 La. 983, 149 So. 541; State v. City of Des Moines, 221 Iowa 642, 266 N. W. 41; State v. Cheyenne County, 127 Neb. 619, 256 N. W. 67; People v. Deep Rock Oil Corporation, 343 Ill. 388, 175 N. E. 572; Bowman v. Continental Oil Co., 256 U. S. 642, 41 S. Ct. 606, 65 L. Ed. 1139; Edelman v. Boeing Air Transport, 289 U. S. 249, 53 S. Ct. 591, 77 L. Ed. 1155.

The "gasoline license tax now imposed by the law of Montana upon purchases of gasoline used for the operation of aircraft" (Ch. 152, Laws 1945, sec. 20, p. 346) was clearly an imposition made by the state for the supply of the public treasury and therefore a tax. "A tax is an imposition for the supply of the public treasury and not for the supply of individuals or private

corporations, however benevolent they may be." 51 Am. Jur., Taxation, p. 40, note 19. "A tax is a forced * * * exaction [or] imposition * * * by authority of a sovereign state upon the persons or property within its jurisdiction, to provide public revenue for the support of the government, and administration of the law, or the payment of public expenses. Any payment exacted by the state or its municipal subdivisions as a contribution toward the cost of maintaining governmental functions, where the special benefits derived from their performance is merged in the general benefit, is a tax." 51 Am. Jur., Taxation, pp. 35-38, sec. 3.

The gasoline tax imposed by the laws of Montana (Ch. 152, Laws 1945) on purchases of gasoline used in the operation of aircraft was levied and collected for state purposes, namely, for the purpose of paying for the support and maintenance of an administrative agency of the state designated as the state aeronautics commission and for paying the costs and expenses of such commission in administering the Act. Ch. 152, Laws 1945. Being taxes levied and collected for state purposes, the proceeds of such taxes were paid into the state treasury pursuant to the requirements of Art. XII, sec. 10, which provides: "All taxes levied for state purposes shall be paid into the state treasury * * *." The state treasurer is designated the treasurer of every state commission or department, and all moneys received by such commissions and departments must be deposited with the state treasurer. Sec. 192, Rev. Codes 1935. So it is that, pursuant to the foregoing constitutional and statutory mandate, there has been paid into the state treasury and credited to the state aviation fund the proceeds of the gasoline tax imposed by the laws of Montana (Ch. 152, Laws 1945) upon purchases of gasoline used for the operation of aircraft. No one here questions that the public moneys collected by virtue of the gasoline license tax imposed by the laws of Montana were properly paid *into* the state treasury. The relator by this proceeding seeks to accomplish the *withdrawal* and the *paying out* of these public moneys from the public treasury but this *paying out* the Con-

stitution says shall not be done "except upon appropriations made by law." Const. Mont. Art. V, sec. 34; Art. XII, sec. 10.

It matters not whether the legislature directs the money collected in taxes to be placed in the general fund or in a special fund created for the use of a particular public agency. The moneys remain public moneys and require an appropriation by the legislative assembly to authorize the state treasurer to *pay out* or *withdraw* same.

It is within the province of the legislature to direct in what particular fund in the state treasury that the proceeds of the tax collections provided for are to be paid but such direction cannot affect the clauses in the Constitution prohibiting the withdrawal or paying out of such moneys without a new legislative appropriation each two years. The requirements of the Constitution have been met through the years. The last legislative assembly (1947) in the enactment of House Bill 437 made appropriations out of various special funds in the state treasury including the livestock commission fund, the livestock sanitary board fund, the bounty fund, the industrial accident fund, the state highway fund, the gasoline drawback fund, the beer act fund, the motor vehicle recording fund and others but it made no appropriation of any part of the state aviation fund. Session Laws of 1947, pp. 748-782.

The clauses of the Constitution here applicable were involved in the early case of State v. Kenney, 9 Mont. 389, 396, 24 Pac. 96, 97, where, referring to section 34 of Art. V and section 10 of Art. XII, this court, speaking through Chief Justice Henry N. Blake, said:

"The history of this vital clause of the constitution forms a grand part in the struggle for liberty between the people and monarchs of England. In Magna Charta it is confirmed that 'no scutage or aid shall be imposed in our kingdom unless by the general council of our kingdom.' In 1688, the act 'for declaring the rights and liberties of the subject, and settling the succession of the crown' (or bill of rights), declared 'that levying money for or to the use of the crown by pretence of prerogative, without

grant of parliament, for longer time, or in other manner than the same is or shall be granted, is illegal.'

"Words have changed in signification during the progress of time, but the principle has not been modified, and this bulwark of freedom has been preserved in the constitutions of the states of the Union. * * * We conclude from the authorities supra, that the respondent [state auditor] cannot draw his warrant upon the treasurer of the state in payment of the claim of the relator, in the absence of an appropriation by law. The foregoing prohibitions of the constitution refer to the auditor as well as the treasurer, and any other officer who is empowered to disburse the public funds, in pursuance of a lawful appropriation."

In State ex rel. Dean v. Brandjord, 108 Mont. 447, 92 Pac. (2d) 273, 276, this court held that, through section 34 of Article V of the state Constitution, "control of the purse strings of the state treasury were explicitly placed in the hands of the law-making branch of the government, to be tightened or loosened at its will. * * * But the mere duty on the part of the legislature to make an appropriation does not satisfy the requirement of an 'appropriation by law' any more than does the promise of the government to pay money or make an appropriation."

"Funds" and "appropriations" are not the same for a fund may exist without provisions being made for any appropriation therefrom. Raymond v. Christian, 24 Cal. App. (2d) 92, 74 Pac. (2d) 536, 546. So here there is a fund created by statute but the 30th legislative assembly made no provisions for any appropriation therefrom for the fiscal years 1947-1948 and 1948-1949.

The majority opinion erroneously assumes that when public moneys are placed in a special fund or elsewhere than in the general fund that no legislative appropriation is required as a condition precedent to their paying out and withdrawal. The assumption overlooks the facts that it is the *source* that is determinative of whether or not the moneys are public moneys and that when the *source* of the moneys is found to be forced exac-

tions or impositions effected by the authority of the state upon persons or property to provide public revenue for the support of the government and its agencies that such moneys are public moneys and may not be paid out or withdrawn except upon appropriations made by the legislature.

The majority opinion asserts that section 10 of Article XII, supra, and other constitutional provisions relating to taxation have no application to license fees or taxes imposed for regulatory purposes as distinguished from property taxes. Such is not the law nor has it ever been the law of this state. The last sentence of section 1 of Article XII of the Constitution expressly empowers the legislative assembly to "impose a license tax, both upon persons and upon corporations doing business in the state."

That public moneys are by direction of the legislature placed in the state treasury in a special fund designated as the state aviation fund is of no importance. State ex rel. Diederichs v. State Highway Comm., supra. "It is well settled that a license may be required either for taxation purposes or to defray the expense of regulation and that the legislature has power to impose license taxes for revenue purposes under section 1 of Article XII, Constitution of Montana. Johnson v. City of Great Falls, 38 Mont. 369, 99 Pac. 1059, 16 Ann. Cas. 974." State ex rel. State Board of Equalization v. Glacier Park Co., 118 Mont. 205, 164 Pac. (2d) 366, 368.

Numerous cases are cited in the majority opinion holding that the above quoted clauses of the Constitution have no application to trust funds but this case is not concerned with trust funds for by no stretch of the imagination can the excise gasoline taxes paid into the state aviation fund in the state treasury pursuant to Chapter 152, Laws 1945, and section 192, Rev. Codes 1935, be said to constitute a "trust fund."

Various cases from other jurisdictions involving wholly different constitutions and statutes are cited in the majority opinion but each of such cases is clearly distinguishable from the case at bar which is concerned only with the construction to be given

to the clear provisions of Montana's Constitution and statutes. The same section of the state Constitution that prohibits the paying of money out of the treasury "except upon appropriation made by law" also prohibits the paying out of such money except "on warrant drawn by the proper officers." Art. V, sec. 34.

If, as the majority opinion asserts, the foregoing constitutional provisions "have no application to license fees or taxes imposed for regulatory purposes" then the treasurer would be authorized to pay out in cash such moneys to the various claimants upon their mere asking. There would be no need for locating an unexhausted appropriation made by law nor for issuing or presenting a warrant to authorize the state treasurer to withdraw from the treasury and hand over to claimants the moneys demanded in their respective claims. But says the Supreme Court in Reeside v. Walker, supra: "No officer, however high, not even the President, much less the secretary of the treasury, or treasurer, is empowered to pay debts of the United States generally, when presented to them." Clearly the clauses of the Constitution above quoted are applicable and there must be an unexhausted appropriation, approval of the claims by the state board of examiners and proper warrant drawn on the proper fund before the state treasurer is authorized to pay out of the treasury any moneys on the claims.

In State ex rel. Diedrichs v. State Highway Commission, 89 Mont. 205, 296 Pac. 1033, 1034, it is said:

"We are mindful, too that the declarations of Constitutions are placed therein to be obeyed, and are not to be frittered away by construction. Less v. City of Butte, 28 Mont. 27, 72 Pac. 140, 61 L. R. A. 601, 98 Am. St. Rep. 545. Our duty in this respect remains the same no matter how urgent may be the desire to obtain money with which to carry on the much-needed program of highway construction. As stated by that able jurist, Chief Justice Taney of the United States Supreme Court, in the famous Dred Scott decision (Scott v. Sandford, 19 How., U. S., 393, 15 L. Ed. [691], 692): 'No change in public opinion on questions of public policy can ever be given any weight in construing the

provisions of a constitution where the meaning is clear, for the adoption of a constitution that might be deemed wise at one time and unwise at another would abrogate the judicial character of the court and make it the reflex of the popular opinion or passion of the day.' * * *

"The fund raised from the motor fuels excise tax results from one of the constitutional methods of raising public revenues. State v. Sunburst Refining Co., 73 Mont. 68, 235 Pac. 428. * * * The people are gravely concerned as to how and the purposes for which their money is spent. * * * In the language of the Supreme Court of Iowa, in State ex rel. Fletcher v. Executive Council, supra [207 Iowa 923, 223 N. W. 737, 743] : 'The responsibility thus facing us is one not of our seeking, nor of our liking, nor yet one which we would dare evade. We are assured, too, that in the long event the duty we owe, not only to the litigants, but to our co-ordinate departments of government, is to undertake frankly the judicial responsibility which litigation casts upon us, and to declare faithfully our judicial convictions therein. In such a case our primary concern is, and must be, directed to the soundness of our conclusion, and not to its consequences. Consequences are inevitable in every litigation and are commensurate with the magnitude thereof. They are not judicially made, nor can we make them less or more.' As the great Justice Story said in the Dartmouth College case, 4 Wheat., U. S., 518, 4 L. Ed. 629: 'We have nothing to do but pronounce the law as we find it; and having done this, our justification must be left to the impartial judgment of our country.' "

The governor, the attorney general and the secretary of state observed the prohibitions and obeyed the mandates of the Constitution and the statutes by withholding approval of the claims in the absence of a legislative appropriation. For this they should be commended,—not censured.

Under our Constitution and system it becomes the duty of the state legislative assembly each two years to examine into and carefully scrutinize the entire fiscal base of the state and to take affirmative legislative action respecting the withdrawal and pay-

ing out of the state treasury of the public moneys that have been exacted from the people of the state by the sovereign power of the state exercised through its legislative department. It is the duty of the executive department of the government as claims are presented against the state to examine into and determine whether the legislative department has taken the requisite affirmative action by appropriating the public moneys to pay the claims before the executive branch authorizes the withdrawal and paying out of such moneys.

The governor, the attorney general, and the secretary of state, constituting the state board of examiners first examine the claims as presented and check them against the appropriations made by the legislative assembly. If approved another constitutional executive officer, namely the state auditor, checks the claims against unexhausted legislative appropriations out of which they may be paid before issuing his warrant. If warrants are issued and presented for payment then another constitutional executive officer, namely the state treasurer, checks the warrants against unexhausted legislative appropriations out of which he may pay the public moneys to satisfy the warrants so presented. Thus under our system there are three separate checkups on whether or not the legislature has taken affirmative action and provided an appropriation out of which the claims may be paid.

To give judicial blessing to a change from the above constitutional method so long followed requiring a legislative appropriation and substituting therefor a system which nullifies the constitutional prohibitions and mandates by the simple device of providing for the placing of tax moneys in special funds and then declaring such special funds to be free from biennial legislative control and terminable only upon the direct action of the legislature is not only repugnant to our system but it is extremely dangerous to our form of government. Not only does it upset the long established, orderly system designed to protect against the unauthorized paying out of the public moneys from the public treasury, but it destroys one of the most carefully guarded and hard won rights guaranteed by our Constitution,

namely the right to require the legislature to examine into the financial structure of the state each two years and to have the legislative assembly go on record by taking affirmative action respecting the paying out and expenditure of such public moneys so extracted from the pockets of the taxpayers in the state.

In my opinion the governor, attorney general, and secretary of state followed the plain mandate of the law in withholding approval of the claims. For this court to now compel such officers to approve the claims in the absence of a legislative appropriation is to compel them to violate the express prohibitions of the state's Constitution.

*Total Drawback Statute.* Under the provisions of section 2396.4, Revised Codes of Montana of 1935 as amended by Chapter 67 of the Session Laws of 1939, page 116, the purchaser of gasoline used in operating aeroplanes or aircraft is allowed a refund or drawback of *all* the gasoline tax paid by him being an amount of money equal to five cents multiplied by the number of gallons of gasoline so purchased and used.

*Partial Drawback Statute.* In 1945 the 29th legislative assembly amended the aforesaid statutes by the enactment of section 20 of Chapter 152 of the Session Laws of 1945, which allows the purchaser of gasoline "purchased and used for the operation of aeroplanes or aircraft" a refund or drawback of only *a part* of the gasoline tax paid by him reducing "from five cents to four cents per gallon the amount of gasoline license tax which may be refunded on purchases of gasoline used in the operation of aircraft," but leaving "otherwise unchanged the provisions of said section 2396.4." Ch. 152, Laws 1945, sec. 20, page 346.

*Repeal of Partial Drawback Statute.* In 1947 the 30th legislative assembly enacted Chapter 130, Laws of 1947, effective from and after February 28, 1947, which act specifically amends section 2396.4, Revised Codes of Montana of 1935 as amended by Chapter 67 of the Session Laws of 1939 and provides that the purchaser of gasoline used in operating aeroplanes or aircraft "shall be allowed and paid as a refund or drawback an

amount of money equal to five cents (5¢) multiplied by the number of gallons of gasoline so purchased and used,'' and further providing that, ''All acts and parts of acts in conflict herewith are hereby repealed.'' The provisions of the 1945 Act (Ch. 152, Laws of 1945, sec. 20, page 346) allowing a refund of only *a part* of the gasoline tax paid or four cents per gallon are clearly in conflict with the provisions of the 1947 Act (Ch. 130, Laws of 1947, pages 168-171) which provide for a refund of *all* the gasoline tax paid being an amount equal to five cents per gallon hence the aforesaid conflicting provisions of the old 1945 Act must give way to and are repealed by the subsequent Act of the 1947 legislature. The effect of such repeal is to deprive the state aviation fund of its chief source of revenue, being the revenue derived since February 28, 1947 from the proceeds of said one cent per gallon out of each five cents per gallon of gasoline license tax imposed by the laws of Montana upon the purchases of gasoline used for the operation of aircraft. Under the present statute (Chapter 130, Laws of 1947) the purchaser of gasoline used for operating aeroplanes or aircraft is allowed as a refund or drawback *all* the gasoline tax he has paid on such gasoline leaving *nothing* that may be paid into the state aviation fund from such source.

Thus the 1947 legislative assembly not only made no appropriation whatever of any moneys in the state aviation fund but by the enactment of Chapter 130 of the Session Laws of 1947 it took from such fund its chief source of revenue by reserving no part of the gasoline taxes paid by the purchasers of gasoline used for operating aircraft and by allowing such purchasers refunds or drawbacks of *all* the gasoline tax money collected from them.

In this case the relator has failed to establish the violation of official duty upon the part of any of the executive officers sought to be coerced or to establish a clear right in relator for the relief prayed for and, accordingly, the alternative writ of mandamus should be quashed, the peremptory writ be denied and the proceeding be dismissed.

MR. JUSTICE METCALF (dissenting):

The sole question is whether a specific appropriation is a necessary prerequisite for the expenditure of money from the aviation fund to carry on the activities of the state aeronautics commission.

The majority of the court has concluded that the tax of 1 cent per gallon on aviation gasoline is a license tax for regulatory purposes payable into a special fund and is therefore not subject to constitutional prohibitions contained in section 12 of Article XII, section 34 of Article V and section 10 of Article XII. Section 34 of Article V declares that *"No money* shall be paid out of the treasury except upon appropriations made by law * * *"* and section 12 of Article XII says that "No appropriation of *public moneys* shall be made for a longer term than two years." (Emphasis added.) These two provisions of the Constitution make no distinction between money raised for revenue purposes and money paid to the state as a result of the exercise of the police power. "Public moneys" are moneys belonging to the state (sec. 11320, Rev. Codes 1935; State v. Mc-Graw, 74 Mont. 152, 240 Pac. 812; Morgan v. Crow, 183 Ga. 147, 187 S. E. 840) and are moneys raised by operation of law for the support of the government or for the discharge of the obligations of government. 42 Am. Jur., "Public Funds," sec. 2.

All money raised as a result of the exercise of the sovereign power of the legislature is public money. "Without attempting an all-inclusive definition of the words 'public money' as used in our constitution, they certainly include money raised by the state by compulsory process in order to carry out one of its governmental purposes and deposited in the state treasury until properly disbursed. State ex rel. Taylor v. Robinson, 59 Idaho 485, 495, 83 Pac. (2d) 983; Tesch v. Board of Deposits, 237 Wis. 527, 531, 297 N. W. 379; Branch v. United States, 12 Ct. Cl. 281, 289; Storen v. Sexton, 209 Ind. 589, 597, 200 N. E. 251, 104 A. L. R. 1359; State ex rel. St. Louis Police Relief Ass'n v. Igoe, 340 Mo. 1166, 1174, 107 S. W. (2d) 929; * * *" Dowe v. Egan, 133 Conn. 112, 48 A. (2d) 735, 738.

Examples of license fees which have been held to be public moneys are: License fees collected by the state board of pharmacy for the privilege of practicing pharmacy (Texas Pharmaceutical Ass'n v. Dooley, Tex. Civ. App., 90 S. W. (2d) 328); Motor Vehicle license fees (Downey v. Mayr, 95 Ind. App. 179, 182 N. E. 872, 874); dog license taxes (Fox v. Mohawk & H. R. Humane Society, 165 N. Y. 517, 59 N. E. 353, 51 L. R. A. 681, 80 Am. St. Rep. 767); farm bureau funds (State Bank of Commerce by Broderick v. Stone, 144 Misc. 393, 258 N. Y. S. 717, 718).

Under these constitutional provisions it is immaterial whether the money is paid the state as a result of a revenue tax or is received from a license tax imposed under the police power. It is all income arising out of the exercise of the sovereign power of the state and is therefore public money and subject to the constitutional prohibitions. Department of Finance v. Gandolfi, 375 Ill. 237, 30 N. E. (2d) 737.

Nor does the fact that the legislature has appropriated money from the gasoline drawback fund alter the situation. That appropriation (pp. 761 and 776, Laws 1947) is the means whereby the money is paid into the aviation fund. When a tax is paid upon gasoline used for aviation the appropriation is for a gasoline drawback "much as may be necessary to comply with the provisions of the law." The law provides that 4 cents per gallon shall be refunded. The money for the refund is specifically appropriated by the legislature. The legislature has further declared that 1 cent per gallon tax shall be transferred from the gasoline drawback fund to the aviation fund. The source of the fund is this 1 cent per gallon that is taken from the consumer and after passing through the gasoline drawback fund comes to the aviation fund. In this sense it is no different than money that is paid into the public school general fund, the common school equalization fund, the industrial accident administrative fund, and many others. It can only be paid out of the fund in accordance with constitutional procedure.

Section 10. of Article XII provides, "All taxes levied for

state purposes shall be paid into the state treasury, and no money shall be drawn from the treasury but in pursuance of specific appropriations made by law.'' It is unquestioned that there is a substantial difference between property taxes levied for the purpose of raising revenue and license taxes imposed for the purpose of regulation. The majority contends that this section applies only to taxes levied for the purpose of raising revenue and standing alone the section is open to the construction given it by the majority of the court. It is equally well recognized that the general term ''taxes'' is often used indiscriminately in statutes and in state Constitutions to mean either revenue taxes or regulatory taxes or both. 51 Am. Jur., ''Taxation,'' sec. 13; 33 Am. Jur., ''Licenses,'' secs. 2 and 3. Reading all three constitutional provisions together it is apparent that the Constitution does not distinguish between property taxes, license taxes, excise taxes, etc, but contemplates that the word ''taxes'' shall be used in its broadest and most comprehensive sense to include every charge or burden imposed by the sovereign power upon persons, property or privileges.

The test then is not whether this tax was imposed for regulatory purposes as a license tax or whether it is a revenue measure. The test is whether or not the moneys received from the tax are public moneys. They are public moneys, then they should be paid into the state treasury and may only be paid out of the state treasury upon a specific appropriation made by law. I cannot agree that there can be such a thing as a ''continuing'' appropriation of public moneys. To rely upon a continuing appropriation is to admit that an appropriation was initially necessary and if an appropriation was necessary to originally pay public moneys out of the state treasury, then section 12 of Article XII comes into operation and prohibits any such appropriation from continuing for a longer term than two years.

It is my opinion that the board of examiners were correct in refusing to allow the claims for expenses of relators and that the application for the writ should be denied.