BRACKMAN, Respondent, v. KRUSE, Com'r of Agriculture, et al., Appellants (WESTLAKE et al., Interveners).

No. 8779.

Submitted May 19, 1948. Decided November 8, 1948.

199 Pac. (2d) 971.

R. V. Bottomly, Atty. Gen., and Clarence Hanley, Asst. Atty. Gen., for defendants and appellants. Mr. Hanley argued the cause orally.

E. G. Toomey, of Helena, and Claude C. Gray, of Big Timber, for plaintiffs in intervention and appellants. Mr. Toomey argued the cause orally.

Stanley R. Foot, and Arthur P. Acher, both of Helena, for plaintiff and respondent. Mr. Foot and Mr. Acher argued the cause orally.

Ralph J. Anderson, of Helena, amicus curiae. Mr. Anderson argued the cause orally.

MR. CHIEF JUSTICE ADAIR:

This is an action for a declaratory judgment commenced in the district court to have determined and declared the consti-

tutionality of sections 2620.45 and 2620.46, Revised Codes of Montana 1935.

The judgment declares unconstitutional and void so much of section 2620.45, Revised Codes, as imposes license fees of $250 per quarter upon wholesale dealers in oleomargarine and $100 per quarter upon retail dealers in oleomargarine. It also enjoins the collection of said license fees as a condition precedent to wholesale and retail dealers engaging in the business of selling oleomargarine in the state of Montana. There are two appeals from the judgment,—one by the defendants and the other by the intervenors in the action.

The plaintiff, O. L. Brackman, an individual, is a citizen, resident and taxpayer of Lewis and Clark county, Montana, owning and operating two retail stores in the city of Helena, and therein selling at retail, groceries, meats and dairy and food products generally. By virtue of store licenses regularly issued to him by the state board of equalization, by the state board of health and by the state board of food distributors, plaintiff is authorized to transact such business. He is desirous of selling oleomargaine in his stores, for which there is now a great demand by the consuming public but by the statutes in question he is required to first obtain separate state licenses for the selling of oleomargarine at an additional expense of $800.00 per annum for his two stores under the penalty of being adjudged guilty of a misdemeanor punishable by a fine of not less than $100.00 and not more than $500.00 or by imprisonment in the county jail for not less than 30 days nor more than six months or by both such fine and imprisonment. Sections 2620.45 and 2620.46, Rev. Codes 1935. Plaintiff alleges said sections are invalid in that they injuriously affect and deny the individual rights guaranteed him by the federal and state constitutions.

The two defendants, i. e., the commissioner of agriculture and the dairy commissioner of the state, are the administrative officers authorized by law to administer and enforce the law, including sections 2620.43 to 2620.46, R. C. M., providing for

the regulation of the production and sale of dairy products and oleomargarine.

July 2, 1945, plaintiff filed his complaint alleging, inter alia: That oleomargarine is a nutritious, wholesome, healthful food containing no deleterious or unhealthful ingredients; that the license fees provided for in section 2620.45, R. C. M., were designed to discourage or prohibit the sale of oleomargarine in aid of the dairy industry; that such fees are so excessive and unreasonable in amount as to prohibit plaintiff and more than 92% of the other grocery stores operating in Montana from selling such product in that the fees so required are so high as to be prohibitive of a useful and general occupation; that by reason of the prohibitive and confiscatory license fees required of him, plaintiff as well as the majority of other retail dealers similarly situated are denied the right to sell oleomargarine; that while sections 2620.43 to 2620.46, R. C. M., inclusive, purport to have been enacted in the exercise of the police power of the state, yet the excessive, confiscatory and prohibitory license fees provided for in the statute, in effect, prohibit the carrying on of a legitimate, profitable industry and the sale of a healthful, nutritious food and that such prohibition is not necessary for the protection of public health, morals, safety or welfare all in violation of the 14th Amendment to the Federal Constitution and of sections 3 and 27 of Article III and sections 1 and 11 of Article XII of the state constitution.

On September 27, 1945, the attorney general filed an answer for and on behalf of defendants admitting that oleomargarine is a nutritious, wholesome, healthful food containing no deleterious or harmful ingredients but denying most of the other allegations of the complaint. Issue being joined with the filing of the answer, the cause was set for trial.

Three days before the date set for the trial, to-wit, on January 28, 1946, on leave granted on an ex parte application therefor, various dairymen and buttermakers whose products are sold in this state in competition with oleomargarine, filed a complaint and answer in intervention placing in issue most

of the allegations of plaintiff's complaint. On plaintiff's motion the trial court made an order striking intervenors' complaint and answer in intervention and thereafter, on intervenors' petition in an original proceeding, this court set aside and annulled said order of the trial court. See State ex rel. Westlake et al. v. District Court, 118 Mont. 414, 167 Pac. (2d) 588, 163 A. L. R. 911.

May 11, 1946, the intervenors filed an amended complaint and answer in intervention to which plaintiff interposed a demurrer. The district court made an order sustaining the demurrer but, on intervenors' petition in a second original proceeding, this court set aside said order of the trial court. See State ex rel. Westlake et al. v. District Court, Mont, 173 Pac. (2d) 896, 169 A. L. R. 827.

The amended complaint in intervention inter alia alleges: That for the most part intervenors are farmers and ranchers engaged in producing and selling milk, cream and dairy products in the open market in the state of Montana; that they are also buyers on such open market and consumers of milk, cream, butter and other dairy products; that they have intervened in the action not only on their own behalf but also for and on behalf of all members of the public similarly situated as owners of dairy cows—as producers of butter and dairy products and also as buyers and consumers of dairy products in the markets of this state for human consumption and use; that the enactment of the statutes in question was in the exercise of the police power and for the protection of the public health, safety and morals of the state and that by such legislation the state assumes to and that it does supervise, regulate, police and tax the activities, functions, business and dairy products of intervenors; that said statutes govern and apply not only to intervenors and their dairy products but also to plaintiff as a distributor of dairy products and in particular if he would sell or assume to sell oleomargarine to the public in Montana; that oleomargarine is a commercial product, synthetic in nature, made of various oils and fats; that "oleomargarine as such is

not necessarily healthful, nutritious or wholesome as an edible food for human beings, and particularly as compared with butter as defined by the statutes of Montana''; and that ''the feeding to animals (as distinguished from humans) of cottonseed oil and of soy bean oil, such as constitute the basis of oleomargarine, must be restricted in order to avoid injurious results.''

By reply filed November 30, 1946, plaintiff placed in issue the new matter contained in the amended complaint in intervention. After a trial lasting four days and the introduction of much evidence the court rendered its judgment incorporating therein specific findings of fact and conclusions of law.

*Findings and Conclusions.* The findings of fact and conclusions of law are as follows:

''1. That at all of the times herein mentioned the defendants above named were and now are the administrative officers authorized by law to administer and enforce the laws of the State of Montana providing for the regulation of the production and sale of dairy products as provided for in Chapter 240 of the Political Code, Revised Codes of Montana, 1935, including Secs. 2620.25, 2620.35 and 2620.43 to 2620.46 inclusive relating to the sale of oleomargarine.

''2. That oleomargarine is a nutritious, wholesome, healthful food; that oleomargarine is not in all respects a substitute for butter; that it contains no deleterious or unhealthful ingredients and is sold upon its own merits, and under such circumstances that every purchaser and every user is fully advised that he is purchasing or using oleomargarine and not butter.

''3. That the manufacture and sale of oleomargarine in interstate commerce is under the regulation of the Internal Revenue Department of the United States, and its labeling and packaging is subject to the regulation of the Pure Food and Drug Acts [Federal Food, Drug and Cosmetic Acts, 21 U. S. C. A. sec. 301 et seq.], of the United States; that no oleomargarine is manufactured within the State of Montana, all oleo-

margarine sold within said State being shipped from other states to the State of Montana, in interstate commerce.

"4. That the cost price of oleomargarine at wholesale and the selling price at retail in Montana has for many years last past and at the time of the commencement of this action were maintained at levels so that the gross profit to a retail seller thereof was and is approximately four cents (4¢) per pound.

"5. That there are over fourteen hundred food stores within the State of Montana engaged in the sale of groceries and dairy products, including butter and food products generally.

"6. That the provisions of Section 2620.45 require a license fee to be paid by retail dealers in oleomargarine which is so excessive and unreasonable in amount as to prohibit the sale of oleomargarine by more than 92% of the grocery stores in Montana, including those operated by the plaintiff, said license fee so required being so high as to be prohibitive of a useful and general occupation and privilege; that a great demand exists at the present time in the retail trade for oleomargarine as that article is defined by Section 2620.43, R. C. M. 1935, as amended by Chapter 98, Session Laws of 1941; that by reason of the prohibitive and confiscatory license fee required under the provisions of Section 2620.45, plaintiff and the overwhelming majority of other retail dealers similarly situated are denied the right to sell this food product.

"7. That since the enactment of Section 2620.45, the majority of retail dealers procuring licenses to sell oleomargarine at retail to the consuming public have failed to sell sufficient quantity of oleomargarine to reimburse them for the cost of the license; that accordingly licenses have only been obtained by large retail operators and chain store operators, who have been willing to sell oleomargarine at a loss, but nevertheless have maintained oleomargarine, as an article for sale as an attraction to induce customers to patronize their stores, or who benefit from the fact that the license fee required under Section 2620.45 is so high that it gives them a monopoly on the sale of this food product and thus enables them to sell a sufficient

quantity to reimburse them for the cost of the license; that the plaintiff and other retail dealers similarly situated, of necessity, are not in position to fairly compete with the owners of licenses to sell oleomargarine, as they are unable to have on hand for sale this food product, now greatly in demand by the consuming public.

"8. That Section 2620.45 was passed in the exercise of the police power, but the excessive, confiscatory and prohibitive license fee provided for by Section 2620.45 in effect prohibits the carrying on of a legitimate, profitable industry, and the sale of a healthful, nutritious food by the majority of the retail food stores in Montana, although such prohibition is not necessary for the protection of the public health, morals, safety or welfare; that said act denies to plaintiff the equal protection of the laws by creating a monopoly for the benefit of a few engaged in the sale of food products at retail who otherwise than for their ability to afford to sell oleomargarine at a loss, in expectation of additional sales of other products to consumers compelled to patronize their stores for this product, are engaged in a business identical with that of plaintiff.

"9. That no reasonable relation exists between the amount collected from the license fees under Section 2620.45, and the amount of money expended in the enforcement of the Act, the amount collected from licenses being so much in excess of the amount reasonably required for regulatory supervision as to indicate that the license fee prescribed could not have been based upon any possible estimate of the probable cost of supervision but upon the contrary that the general purpose and intent of the Act was to prohibit the sale of oleomargarine in Montana.

"10. That if Section 2620.45 is treated as a revenue measure, the retail dealers' license fee provided for is so high as to be confiscatory and prohibitive of a useful occupation and privilege, and to create a monopoly for the benefit of a few merchants.

"By virtue of the foregoing Findings of Fact, the Court makes the following *Conclusions of Law*:

"(1) That said Section 2620.45 is in violation of the provisions of the Fourteenth Amendment to the Constitution of the United States in that it deprives plaintiffs and others similarly situated of liberty and property without due process of law and denies to them the equal protection of the laws.

"(2) That said section is in violation of Sections 3 and 27 of Article III of the Constitution of Montana, in that it denies to plaintiff and others similarly situated the right to carry on a lawful business without due process of law.

"(3) That said section is in violation of Sections 1 and 11 of Article XII of the Constitution of Montana, in that it assesses a tax which results in unreasonable and arbitarary discrimination.

"(4) That said section is in violation of Article XII of the Constitution of Montana in that it levies a tax not for a public or government purpose, but upon the contrary for a private purpose, that is to say, for the purpose of prohibiting in large part the sale of oleomargarine in Montana in aid of the diary industry."

Defendants assign as error the making of findings Nos. 6 to 10, inclusive, and intervenors, assign as error the making of findings Nos. 1 to 9, inclusive.

There is ample substantial evidence in the record before us to sustain each finding of fact and conclusion made.

Defendants and intervenors all specify as error the making of the trial court's conclusions of law and the rendering of judgment for plaintiff but we find no merit in such specifications. The conclusions and the judgment find ample support in the evidence introduced, in the findings made and in the authorities hereinafter cited.

The statutes involved were originally enacted as part of Chapter 93, Session Laws of 1929, comprising 57 consecutively numbered sections. Plaintiff alleges and the intervenors admit that in passing the original act the legislature assumed to exercise the police power of the state to enact a regulatory measure.

However, the attorney general and the defendants early sensed the danger in attempting to sustain the Act as a regulatory measure and therefore denied that it was enacted under the police power of the state; denied that it is a regulatory measure and contend that it was and is nothing other than a simple revenue measure.

A mere reading of the Act discloses its true character. Chapter 93 of the Session Laws of 1929 is entitled: "An Act *to Regulate* the Dairy Industry in the State of Montana and *to Govern* the Operation of Creameries, Milk and Cream Buying and Collecting Stations, Butter, Cheese, and Ice Cream Factories and All Establishments Producing, Handling, or Manufacturing Dairy Products; Defining the Terms Used in This Act; Designating the Powers and Duties of the Department of Agriculture, Labor and Industry in Relation to the Dairy Industry and the Enterprises *Regulated* by This Act; *Governing* the Operation of the Babcock Test and the Sampling and Inspection of Dairy Products: *Regulating* the Handling and Sale of Oleomargarine and Other Substitutes for Dairy Products and the Licensing of Persons Dealing Therein: Providing a Schedule of Licenses for Dairies, Creameries, Ice Cream Factories, Persons Collecting Milk or Cream, and All Other Establishments Handling Dairy Products: Defining the Process of Pasteurization, and *Regulating* Its Use, and Requiring the Pasteurization of Milk and Cream Used by Creameries and in the Manufacture of Ice Cream: *Regulating* the Labeling of Dairy Product Containers: Making Certain Anti-monopoly Statutes of the State Applicable to Producers of Dairy Products: Providing Standards of Weight and Measure for Dairy Products: *Regulating* the Labeling of Imported Dairy Products: Providing for the Registration of Dairy *Names and Trade Marks*: *Providing Penalties for the Violation of This Act* and Repealing Sections 2620 to 2633, Both Inclusive, and Sections 3568 to 3572, Both Inclusive, of the Revised Codes of Montana of 1921; All of Chapter 35 of the Session Acts of the Eighteenth Legislative Assembly of 1923 Save and Except Section 11 of said Act; Chapter 51 of the

Session Acts of the Eighteenth Legislative Assembly of 1923; Chapters 153, 165, 166, 187, and 188 of the Session Acts of the Nineteenth Legislative Assembly of 1925, and Chapters 10, 136 and 142 of the Session Acts of the Twentieth Legislative Assembly of 1927, and All Acts and Parts of Acts in Conflict Herewith.'' (Italics ours.)

Section 1 of the Act, now section 2620.1, R. C. M. 1935, was, by the legislature, entitled: ''Regulation of Dairy Industry.'' The section provides that the department of agriculture, labor and industry ''shall have the general regulation of the industry of dairying in this State,'' and that the sanitary inspection of the plants and businesses regulated ''shall be administered by the State Livestock Sanitary Board.''

Section 2 of the Act, now section 2620.2, R. C. M. 1935, was entitled: ''Enforcement of Standards.'' The section provides that the department of agriculture, labor and industry shall enforce part of the laws regulating the standards of dairy products except as to those that are to be enforced by the livestock sanitary board.

Section 5 of the Act, now 2620.5, R. C. M. 1935, was entitled: ''Sampling and Test of Dairy Products.'' The section provides that the department shall provide suitable means for the taking of samples of all dairy products and all imitations thereof.

Section 25 of the Act, now 2620.25, R. C. M. 1935, was entitled: ''Sanitary Control of Dairy Products.'' The section provides for the inspection of stores where dairy products or substitutes therefore are kept, stored or sold.

Section 32 of the Act, now 2620.35, R. C. M. 1935, was entitled: ''Imitation Butter—Regulation of.'' The section regulates the manufacture, sale or exposure for sale of oleomargarine or other substitutes for butter.

Section 38 of the Act, now 2620.43, R. C. M. 1935, was entitled: ''Prohibiting Use of Coloring Matter in Oleomargarine.''

Section 39 of the Act, now 2620.44, R. C. M. 1935, was entitled: ''Regulating Oleomargarine Advertising.''

Section 40 of the Act, now 2620.45, R. C. M. 1935, was entitled: "Oleomargarine Dealers' Licenses."

Section 41 of the Act, now 2620.46, R. C. M. 1935, provides the penalty for the violation of any of the provisions of the preceding sections.

At the time of the enactment of Chapter 93, Session Laws of 1929, including section 40 thereof, now section 2620.45, R. C. M. 1935, the fees, moneys and earnings collected by the department of agriculture, labor and industry, from any and all sources under the provisions of section 3645, R. C. M. 1935, were credited to such department and the claims against such department were then paid out of such fund. The subsequent enactment of Chapter 14, Session Laws of 1941, and particularly section 2 thereof providing that all money received by said department and other departments should be deposited with the state treasurer to the credit of the general fund and repealing section 3645, R. C. M. 1935, cannot affect the status of section 40 of Chapter 93, Session Laws of 1929, *as enacted,* now section 2620.45, R. C. M. 1935, which section must be construed in connection with the other laws then in force including section 3645, Rev. Codes of 1921, in determining the intention of the 1929 Legislature in enacting Chapter 93, Laws of 1929. It follows therefore that at the time of the enactment of the original Act the special fund provided for in section 3645, Rev. Codes of 1921, was in effect the same as the special fund referred to in the case of Flynn v. Horst, 356 Pa. 20, 51 A. (2d) 54. See also 50 Am. Jur. sec. 236, p. 224, notes 10 and 11.

In the recent case of State ex rel. State Aeronautics Commission et al. v. Board of Examiners of State et al., 121 Mont. 402, 194 Pac. (2d) 633, this court fully considered and discussed the distinction between a legislative demand of money under the police power and one made under the power to tax holding that the former is made for regulation and the latter for revenue. There this court held that the one cent per gallon tax imposed by Chapter 152, Laws of 1945, is a regulatory measure enacted in the exercise of the police power and not a revenue measure

enacted under the power to tax. Under the authorities there cited with approval it is clear that the oleomargarine license fee is an exaction under the police power and therefore the exaction must be limited to such reasonable amount as is necessary to cover the cost and expense of the reasonable inspection, supervision or regulation of the sale of such product by the merchants in Montana.

. The test for determining whether a statute imposing a license fee is a regulatory measure enacted in the exercise of the police power or whether it is a revenue measure enacted in the exercise of the taxing power is stated in 53 C. J. S., Licenses, sec. 3, pages 452, 453, as follows: "*When license fee*. If the fee is exacted for the primary purpose of regulating or restraining an occupation or privilege deemed dangerous to the public or to be specially in need of public control, and compliance with certain conditions is required in addition to the payment of the prescribed sum, such fee is a license fee or license tax properly imposed in the exercise of the police power and is not strictly speaking an ordinary tax. * * *"

"*When Tax*. Where the fee is exacted solely or primarily for revenue purposes and payment of the fee gives the right to carry on the business or occupation without the performance of any further conditions, it is not a license fee but a tax imposed under the power of taxation, * * *"

It is quite clear that the Act was enacted, not for the purpose of raising revenue, but under the guise of regulation. See State ex rel. City of Bozeman v. Police Court, 68 Mont. 435, 219 Pac. 810; City of Bozeman v. Nelson, 73 Mont. 147, 156, 237 Pac. 528; State ex rel. State Aeronautics Commission et al. v. Board of Examiners of State et al., 121 Mont. 402, 194 Pac. (2d) 633; Flynn v. Horst, 356 Pa. 20, 51 A. (2d) 54; Mutual Life Ins. Co. v. Martien, 27 Mont. 437, 71 Pac. 470; State v. McKinney, 29 Mont. 375, 74 Pac. 1095, 1 Ann. Cas. 579; Dailey v. Drexel Furniture Co., 259 U. S. 20, 42 S. Ct. 449, 66 L. Ed. 817, 21 A. L. R. 1432; United States v. Constantine, 296 U. S. 287, 56 S. Ct. 223, 80 L. Ed. 233, 238; Grosjean v. American Press Co., 297 U. S.

233, 56 S. Ct. 444, 80 L. Ed. 660; Stewart Dry Goods Co. v. Lewis, 294 U. S. 550, 55 S. Ct. 525, 79 L. Ed. 1054, 1057; 53 C. J. S., Licenses, sec. 3, pages 452, 453, notes 69 to 72, inclusive.

Because of the excessive fee exacted the trial court found that ▇ more than 92% of the merchants of this state are prohibited from handling or selling the product and the evidence discloses that as many as 97 to 98% of the merchants did not have licenses to handle oleomargarine some years. While enacted under the guise of a regulation coming within the police power yet it would appear that the real purpose of passing the legislation was to prohibit the sale of a clean, nutritious and healthful article of food much in demand by the consuming public and that such purpose was for all practical purposes accomplished for a number of years. See Reeves v. Adam Hat Stores, 303 Ky. 633, 198 S. W. (2d) 789; Bessette v. People, 193 Ill. 334, 62 N. E. 215, 56 L. R. A. 558. As is said in 4 Cooley on Taxation, 4th Ed., sec. 1714: "* * * but the grant of authority to impose fees for the purposes of revenue does not warrant their being made so heavy as to be prohibitory, thereby defeating the purpose, where the business or occupation is a useful and lawful one * * *" See also sec. 1809 of the same authority and Baldwin v. City of Blytheville, 212 Ark. 975, 208 S. W. (2d) 458.

Obviously the legislature was and is without power to prohibit ▇ a legitimate business or to create a monopoly in favor of one branch of industry handling food products and against another branch of industry handling equally wholesome articles of food. See State v. Gateway Mortuaries, Inc., 87 Mont. 225, 287 Pac. 156, 68 A. L. R. 1512; Flynn v. Horst, supra; Field Packing Co. v. Glenn, D. C., 5 F. Supp. 4, affirmed in 290 U. S. 177, 54 S. Ct. 138, 78 L. Ed. 252; Ex parte Bock, 125 Cal. App. 375, 13 Pac. (2d) 836; Best & Co. v. City of Omaha, 149 Neb. 868, 33 N. W. (2d) 150; Collins v. New Hampshire, 171 U. S. 30, 18 S. Ct. 768, 43 L. Ed. 60; United States v. Constantine, 296 U. S. 287, 56 S. Ct. 223, 80 L. Ed. 233; Hill v. Wallace, 259 U. S. 44, 42 S. Ct. 453, 66 L. Ed. 822; Bessette v. People, 193 Ill. 334, 62 N. E. 215; State v. Scougal, 3 S. D. 55, 51 N. W. 858, 15 L. R. A.

477, 44 Am. St. Rep. 756; Cache County v. Jensen, 21 Utah 207, 61 Pac. 303; City of Lyons et al. v. Cooper et al., 39 Kan. 324, 18 Pac. 296; People v. Marx, 99 N. Y. 377, 2 N. E. 29, 52 Am. Rep. 34; Jelke Co. v. Emery, 193 Wis. 311, 214 N. W. 369, 53 A. L. R. 463; Gurland v. Town of Kearny, 128 N. J. L. 22, 24 A. (2d) 210; Fletcher Oil Co. v. Bay City, 247 Mich. 572, 226 N. W. 248, 250; Schollenberger v. Commonwealth of Pennsylvania, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49; 11 Am. Jur., "Constitutional Law," sec. 291, p. 1056; 33 Am. Jur., "Licenses," section 44, p. 367; 16 C. J. S., Constitutional Law, sec. 201, page 584; 53 C. J. S., Licenses, sec. 17, page 511 and sec. 19b, page 519.

The dairy commissioner's records disclose that the license fees collected on oleomargarine during the past ten years exceeded the cost of supervision and regulation for an average of 853 per centum. Such evidence fully warrants the trial court's finding that the license fee provided for by section 2620.45, R. C. M. 1935, is excessive, confiscatory and prohibitive.

In Jelke Co. v. Emery, supra [193 Wis. 311, 214 N. W. 373], the court declared invalid a Wisconsin statute prohibiting the sale of oleomargarine, saying: "Under the facts proven in this case, whatever the economics of the situation may be, from the standpoint of constitutional right the Legislature has no more power to prohibit the manufacture and sale of oleomargarine in aid of the dairy industry than it would have to prohibit the raising of sheep in aid of the beef cattle industry, or to prohibit the manufacture and sale of cement for the benefit of the lumber industry. In some cases a proper exercise of the police power results in advantage to a particular class of citizens and to the disadvantage of others. When that is the principal purpose of the measure, courts will look behind even the declared intent of Legislatures, and relieve citizens against oppressive acts, where the primary purpose is not to the protection of the public health, safety, or morals."

In Ex parte Bock, supra [125 Cal. App. 375, 13 Pac. (2d) 837], the court declared invalid a city ordinance exacting a tax of $200 per year from dealers in oleomargarine. There the court

said: "But the legislative determination is not conclusive. As this court said, In re Smith, 143 Cal. 368, 77 Pac. 180: 'The law will not allow the rights of property or business to be invaded under the guise of police regulation for the benefit of the public health or good order, when it is manifest that such is not the object or purpose of the enactment or by-law.' 'The question in each case,' says the Supreme Court of the United States, 'is whether the Legislature has adopted the statute in exercise of a reasonable discretion, or whether its action be a mere excuse for an unjust discrimination or the oppression, or spoilation of a particular class.' Holden v. Hardy, 169 U. S. 366, 18 S. Ct. 383, 42 L. Ed. 780.''

In Gurland v. Town of Kearny, supra [128 N. J. L. 22, 24 A. (2d) 211], the court declared invalid an ordinance exacting a license fee of $300 for each vehicle used in vending ice cream, saying: "Here the license fee of $300 for each bicycle used by prosecutor in connection with his business equals 30% of his gross sales. Neither his business nor any other like legitimate business can long survive such imposts, however much the municipality may need revenue. For a comparison of license fees with relation to gross sales, see Giant Tiger Corp. of Camden v. Board of Com'rs of [City of] Camden, 122 N. J. L. 240, 4 A. (2d) 755; American Grocery Co. v. Board of Commissioners of [City of] New Brunswick, supra, [124 N. J. L. 293, 11 A. (2d) 599, affirmed 126 N. J. L. 367, 19 A. (2d) 696]. The license fee here ($300) is not only clearly unreasonable, oppressive and confiscatory in comparison with the other license fees imposed as aforesaid but, under the proofs, is patently so in fact without recourse to comparisons. We so hold.''

In People v. Marx, supra [99 N. Y. 377, 2 N. E. 33], a New York statute prohibiting the sale of oleomargarine was held void. The court there said: " 'Liberty, in its broad sense, as understood in this country, means the right not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will, to earn his livelihood in any lawful calling, and to pursue

any lawful trade or avocation.' Who will have the temerity to say that these constitutional principles are not violated by an enactment which absolutely prohibits an important branch of industry for the sole reason that it competes with another, and may reduce the price of an article of food for the human race? Measures of this kind are dangerous, even to their promoters. If the argument of the respondents in support of the absolute power of the legislature to prohibit one branch of industry for the purpose of protecting another with which it competes can be sustained, why could not the oleomargarine manufacturers, should they obtain sufficient power to influence or control the legislative councils, prohibit the manufacture or sale· of dairy products? Would arguments then be found 'wanting to demonstrate the invalidity under the constitution of such an act? The principle is the same in both cases. ·The numbers engaged upon each side of the controversy cannot influence the question here. Equal rights to all are what are intended to be secured by the establishment of constitutional limits to legislative power, and impartial tribunals to enforce them.'·'

In Schollenberger v. Commonwealth of Pennsylvania, supra [171 U. S. 1, 18 S. Ct. 761], the court held that the sale of oleomargarine could not be prohibited by statute, saying: ''The general rule to be deduced from the decisions of this court is that a lawful article of commerce cannot be wholly excluded from importation into a state from another state where it was manufactured or grown. A state has power to regulate the introduction of any article, including a food product, so as to insure purity of the article imported, but such police power does not include the total exclusion even of an article of food.''

In Collins v. New Hampshire, supra [171 U. S. 30, 18 S. Ct. 769], the court said: ''In a case like this it is entirely plain that, if the state has not the power to absolutely prohibit the sale of an article of commerce like oleomargarine in its pure state, ·it has no power to provide that such article shall be colored, or rather discolored, by adding a foreign substance to it, in the

matter described in the statute. Pink is not the color of oleo-margarine in its natural state. \* \* \*

"The direct and necessary result of a statute must be taken into consideration when deciding as to its validity, even if that result is not in so many words either enacted or distinctly provided for. In whatever language a statute may be framed, its purpose must be determined by its natural and reasonable effect."

In New State Ice Co. v. Liebmann, 285 U. S. 262, 52 S. Ct. 371, 374, 76 L. Ed. 747, the court said: "Plainly, a regulation which has the effect of denying or unreasonably curtailing the common right to engage in a lawful private business, such as that under review, cannot be upheld consistent with the Fourteenth Amendment. Under that amendment, nothing is more clearly settled than that it is beyond the power of a state, 'under the guise of protecting the public, arbitrarily (to) interfere with private business or prohibit lawful occupations or impose unreasonable and unnecessary restrictions upon them.' \* \* \*

"The control here asserted does not protect against monopoly, but tends to foster it. The aim is not to encourage competition, but to prevent it; not to regulate the business, but to preclude persons from engaging in it."

In Martin v. Nocero Ice Cream Co., 269 Ky. 151, 106 S. W. (2d) 64, 66, the court said: "The evidence introduced by appellees shows conclusively that individuals and corporations engaged in the business of manufacturing and selling ice cream, heretofore prosperous, have been operating at a loss since the tax on ice cream became effective on July 1, 1936, and that the business cannot be conducted at a profit so long as the tax is in effect. \* \* \* A powerful organization of men engaged in different pursuits might prevent the imposition of a prohibitive license tax upon their respective callings or occupations, but what is to become of the man without political power, whose means of livelihood are taken away by the imposition of a prohibitive tax? Shall we still say that the amount of the tax is within the dis-

cretion of the taxing power, or shall we say that among the inalienable and inherent rights guaranteed by our Constitution to every law-abiding citizen is the right to live and enjoy life and the right to acquire property, and that these rights necessarily carry with them the right to gain a livelihood and acquire property by following any useful or legitimate occupation, the pursuit of which is not injurious to the public weal. In our opinion there is but one answer to this question: If you deprive a man of the means of livelihood, you necessarily deprive him of the right to live and enjoy his life. Great as is the taxing power, it can never rise superior to the inalienable rights guaranteed by our Constitution. As the evidence in this case shows that the license tax in question is prohibitive, we have no hesitancy in declaring it invalid.''

In Field Packing Co. v. Glenn, D. C. Ky., 5 F. Supp. 45, affirmed 290 U. S. 177, 54 S. Ct. 138, 78 L. Ed. 252, the court said: ''It is stipulated in the record that oleomargarine, as defined in the act and as sold by the plaintiff, 'is a legitimate, well recognized, pure, nutritious and wholesome food, which is, and for many years has been, an established subject of intrastate and interstate commerce, and is not injurious to the public health, safety, welfare or morals.' Therefore, under the state law, the controversy narrows itself to the single question of whether the tax is prohibitive of the legitimate business of selling oleomargarine. In the light of the record, this question must be answered in the affirmative. It is shown in the record that while oleomargarine is a healthful and nutritious food product, it is at such a disadvantage in competition with dairy butter that it can only compete or find a market when sold at a substantially lower price than butter. There is no disagreement in the testimony on this point, although there is some disagreement as to what the differential must be to enable oleomargarine to find an appreciable market. The evidence is practically unanimous, however, that when the differential falls below 10 cents per pound, oleomargarine sales are greatly reduced, and the preponderance of the evidence is that it is practically impossible for

the product to be sold in competition with butter if the differential is substantially less than 10 cents per pound. * * *

"If the experience of the oleomargarine industry since the enactment of the law has demonstrated that dealers have been unable to sell the product in competition with butter at a sufficient price to cover cost plus a reasonable profit plus the tax, then the law must be held invalid under the state Constitution."

In Lawton v. Steele, 152 U. S. 133, 14 S. Ct. 499, 501, 38 L. Ed. 385, the court said: "The legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations; in other words, its determination as to what is a proper exercise of its police powers is not final or conclusive, but is subject to the supervision of the courts."

In 16 C. J. S., Constitutional Law, sec. 201, page 584, it is said: "Unless the occupation or business is of a nature which is injurious or offensive to the public welfare, see the C. J. S. title Licenses, sec. 19, also 37 C. J. p. 193 note 54, the imposition of a license tax contravenes the constitutional guaranties of person and property where the tax is so unreasonable or arbitrary as to amount to a confiscation of property or a denial of the right to engage in a particular trade, occupation, or profession, particularly when it is levied pursuant to the police power of the state."

In Bessette v. People, supra, the court said [193 Ill. 334, 62 N. E. 218] : "In Allgeyer v. Louisiana, 165 U. S. 578, 17 S. Ct. 427, 41 L. Ed. 832, it was said: 'The right to follow any of the common occupations of life is an inalienable right. It was formulated as such under the phrase, "pursuit of happiness," in the Declaration of Independence, which commenced with the fundamental proposition that "all men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness." This right is a large ingredient in the civil liberty of the citizen.' It was also said in the latter case: 'The liberty of pursuit, the right to follow any of the ordinary callings of

life, is one of the privileges of a citizen of the United States.'
* * *

" 'When the police power is exerted for the purpose of regulating a useful business or occupation, and the mode in which the business may be carried on, * * * the legislature is not the exclusive judge as to what is a reasonable and just restraint upon the constitutional right of the citizen to pursue his calling, and to exercise his own judgment as to the manner of conducting it. The general right of every person to pursue any calling, and to do so in his own way, provided that he does not encroach upon the rights of others, cannot be taken away from him by legislative enactment.' Ruhstrat v. People, supra [185 Ill. 133, 57 N. E. 41, 49 L. R. A. 181, 76 Am. St. Rep. 30], and authorities there referred to. It has also been held that ' "the right to choose one's occupation is the right to be free from unlawful interference or control in the conduct of it." ' Id.; Black Const. Law, p. 412."

In 37 C. J., sec. 37, page 187, it is said: "But where a license or a license tax is imposed under the police power as a means of regulation, it must not be imposed upon such terms and conditions as to operate as the virtual prohibition of a useful and legitimate occupation and business; and this rule has been held to apply, regardless of whether the license tax is levied under the police or the taxing powers." See also 53 C. J. S., Licenses, sec. 17.

In Flynn v. Horst, supra [356 Pa. 20, 51 A. (2d) 56] in holding unconstitutional a legislative act imposing a license fee of $500 a year on wholesalers and $100 per annum on retail dealers in oleomargarine, the court said: "For all the fiscal years between 1931 and 1946, the amount collected from oleomargarine licenses ranges from two to five times the amount expended by the Bureau of Foods and Chemistry in the enforcement of all the laws, the enforcement of which is charged to that Bureau. * * *

"No principle is more firmly established in the law * * * than the principle that a revenue tax cannot be constitutionally

imposed upon a business under the guise of a police regulation, and that if the amount of a 'license fee' is grossly disproportionate to the sum required to pay the cost of the due regulation of the business the 'license fee' act will be struck down. The courts interfere with the discretion of the legislature in such matters only 'where the regulations adopted are arbitrary, oppressive, or unreasonable.' Cooley's Constitutional Limitations, 8th ed., Vol. 2, p. 1228. The regulations in question when tested by this standard require judicial interference with the legislative act creating them.

''We agree with the court below that the facts clearly prove that so much of section 2 of the act challenged, which imposes license fees of $500 upon wholesale dealers in oleomargarine and $100 upon retail dealers in oleomargarine, is unconstitutional and void.''

Intervenors stress the length of time that elapsed after the ██ passage of the Act before it was challenged in this action. The oleomargarine license tax law held unconstitutional in Flynn v. Horst, supra, was on the statute books more than 40 years before the attack was made against it. As was said in Southern Ry. Co. v. City of Richmond, 175 Va. 308, 8 S. E. (2d) 271, 274, 127 A. L. R. 1368 : ''* * * if such an act is plainly in conflict, with the organic law of the state, old age cannot give it life, and, when the issue of constitutionality is properly raised, it must be declared void.''

Intervenors urge that plaintiff lacked the legal capacity to ██ maintain this action and rely upon the case of Chovanak v. Matthews et al., Mont., 188 Pac. (2d) 582. That case is not in point. Here the plaintiff is a merchant operating two grocery stores. His customers want oleomargarine and he desires to supply their wants but is prohibited by the excessive, confiscatory and prohibitive license fee imposed. He must obtain for his patrons the articles of food which they demand or lose their patronage to some competitor who does handle the required product. Manifestly the plaintiff has a much more personal and special interest in the Act imposing the prohibi-

tive license tax upon his right to sell in his stores a wholesome article of food than did the several dairy farmers, buttermakers and farmers' associations who were permitted to intervene in this action, none of whom has anything to do either with the collection or the paying of the license tax and none of whom handles or used oleomargarine. See 39 Am. Jur., Parties, sec. 10, p. 861.

Intervenors attach considerable importance of the definition of "oleomargarine" as contained in the amendment of section 2620.43, R. C. M. 1935, effected by Chapter 98, Session Laws of 1941. The amendment does not affect the constitutional questions involved in the least. The unconstitutional provisions of the original Act as passed in 1929 were not made constitutional by the 1941 amendment requiring that oleomargarine be sold in packages or cartons of a prescribed weight.

The portions of the original Act and the amendment thereof applying to the sale of oleomargarine were and are intended to prohibit the sale of oleomargarine by the ordinary mill run merchant in Montana and from such unwarranted and unlawful interference with their legitimate business the fundamental law of the land protects them.

The cause was carefully tried by the learned judge presiding in the district court and we find his record free from prejudicial error.

The judgment is affirmed.

Associate Justices Choate, Gibson and Angstman, concur.

MR. JUSTICE METCALF, dissenting:

I cannot agree that the tax in question is a regulatory measure passed under the police power. There is no rule laying down a precise test by means of which it can be determined that a license fee is a revenue measure or a police regulation. 51 Am. Jur., Taxation, sec. 68, p. 96. But certain standards have been established which are helpful in the final determination.

In passing upon the constitutionality of a statute we must always bear in mind the cardinal rule that every possible presumption is in favor of the validity of the Act. The Act of the legislature must be held valid unless clearly arbitrary, capricious or unreasonable. This presumption in favor of the validity of the statute is especially strong where the Act has been on the statute books for a long time without contest. In re Mahaffay's Estate, 79 Mont. 10, 23, 254 Pac. 875. In a close case this presumption favoring the validity of a statute would determine whether it should be considered a revenue measure or a police regulation.

"The police power must be distinguished from the taxing power, and the distinction is this: The taxing power is exercised for the purpose of raising revenue, and is subject to certain limitations elsewhere considered, while the police power is exercised only for the purpose of promoting the public welfare, and, although this end may be attained by taxing or licensing occupations, yet the object must always be regulation and not the raising of revenue * * *." State ex rel. Pierce v. Gowdy, 62 Mont. 119, 127, 203 Pac. 1115, 1117.

In the instant case the revenue derived from the tax is greatly in excess of any cost of collection. For example in the fiscal year 1944-1945 the amount collected from oleomargarine licenses was $30,550 and the total expense of maintaining all of the activities of the dairy division was but $22,041.04. In the next year, the fiscal year 1945-1946, licenses for oleomargarine brought in $31,750 and the cost of operating the entire dairy division was $24,752.48. The dairy division has the duty of administering the regulations relating to the dairy industry, including creameries, cheese factories and whole milk plants and enforcement of the egg-grading law, as well as the oleomargarine dealers.

The amount of the fee or charge is properly considered in determining whether it is a tax or an exercise of the police power. The amount may be so large as to itself show that

the purpose was to raise revenue and not to regulate." Cooley on Taxation, 4th Ed., sec. 1786, pp. 3516, 3517.

"* * * if the amount is wholly out of proportion to the expense involved, it will be declared a tax." Detroit Retail Druggists' Ass'n v. City of Detroit, 267 Mich. 405, 255 N. W. 217, 219. And see City of Muskogee v. Wilkins, 73 Okl. 192, 175 Pac. 497; City of Tulsa v. Metropolitan Jewelry Co., 74 Okl. 107, 176 Pac. 956.

By the test of returns this tax must be taken to be a revenue measure.

The title of Chapter 93, Laws of 1929, of which section 2620.45 was a part, might indicate that it was meant to be a regulatory Act. It was entitled: "An Act to Regulate the Dairy Industry in the State of Montana * * *; Designating the Powers and Duties of the Department of Agriculture, Labor and Industry in Relation to the Dairy Industry and the Enterprises Regulated by This Act; * * * Regulating the Handling and Sale of Oleomargarine and Other Substitutes for Dairy Products and the Licensing of Persons Dealing Therein: * * *"

"In determining the type or kind of tax, the substance of the law, rather than a designation or name given it by the Legislature, must be considered." Independent School Dist., Class A, No. 1, Cassia County v. Pfost, 51 Idaho 240, 4 Pac. (2d) 893, 895, 84 A. L. R. 820, and see Educational Films Corp. v. Ward, 282 U. S. 379, 51 S. Ct. 170, 75 L. Ed. 400, 71 A. L. R. 1226.

Another test was laid down in State ex rel. City of Bozeman v. Police Court, 68 Mont. 435, 442, 219 Pac. 810, 812. "A distinction between a license tax and a tax proper or a revenue measure is stated as follows: 'Where the fee is imposed for the purpose of regulation and the statute requires compliance with certain conditions in addition to the payment of the prescribed sum, such sum is a license properly imposed by virtue of the police power; but when it is exacted solely for revenue purposes without any further condition it is a tax.' (17 R. C. L. 479.)"

Section 2620.45, R. C. M. 1935, requires the licensee to make a quarterly report of the number of pounds of butter sold and requires that the license be conspicuously posted in the place of business of the licensee. The latter requirement has been said to be in effect no regulation at all. Ex parte Bock, 25 Cal. App. 375, 13 Pac. (2d) 836.

Section 2620.46, R. C. M. 1935, makes it a misdemeanor to sell oleomargarine without a license. But this does not in any way affect the character of the tax. Giragi v. Moore, 49 Ariz. 74, 81, 64 Pac. (2d) 819, 110 A. L. R. 320, and cases therein cited.

Other sections of Chapter 93 prohibit the sale of oleomargarine colored to resemble butter, sec. 2620.43, Rev. Codes 1935, the sale of oleomargarine to any institution maintained by the state of Montana, sec. 2620.37, Rev. Codes 1935, and in advertising of oleomargarine prohibits the use of the words "dairy," "creamery," "butter," "cream" or any picture of a cow or name of any breeds of cattle. Sec. 2620.44, Rev. Codes 1935.

Looking at the substance of the Act, the limited amount of regulation imposed as contrasted with the revenue produced, it is my opinion that section 2620.45, R. C. M. 1935, is a revenue measure and the license fees imposed are for the primary purpose of revenue and not regulation. This conclusion is buttressed by the admission that oleomargarine is a "nutritious, wholesome and healthful food" and not deleterious to the health or welfare of the people; that all oleomargarine sold within the state of Montana is manufactured outside the state and conforms to the rigorous standards of the federal pure food and drug Act. Federal Food, Drug and Cosmetic Acts, 21 U. S. C. A. sec. 301 et seq. The Act has no provision for inspectors or for the payment of expenses of inspection and regulation. The proceeds of the tax are paid into the general fund of the state and there commingled with other funds rather than kept as a special fund to be used for the administration and supervision of a regulatory Act.

The majority decision is based upon the construction of the Act as a police regulation. There was also a contention that even if the Act were construed as a revenue measure it would be invalid as a violation of the Fourteenth Amendment to the Constitution of the United States and of sections 1 and 11 of Article XII of the Montana Constitution.

There is little point in discussing this phase of the case in view of the majority decision. Suffice to say that it is for the legislature to determine the rate of taxation in order to have revenue to carry on the functions of government. Every tax has an incidental effect of regulation and varies the cost of the article taxed. Oleomargarine like any other commodity, must bear its allocated share of the costs of government. If the legislature wants to tax oleomargarine in order to obtain revenue for the state there can be no constitutional objection to such a course. State v. Hammond Packing Co., 45 Mont. 343, 123 Pac. 407, affirmed 233 U. S. 331, 34 S. Ct. 596, 58 L. Ed. 985; A. Magnano Co. v. Hamilton, 292 U. S. 40, 47, 54 S. Ct. 599, 78 L. Ed. 1109.

It is not a question of whether the tax is high or low until the fee is raised to the point of being prohibitive. (Levin v. City of Asbury Park, 154 A. 742, 9 N. J. Misc. 515) or is so excessively unreasonable as to 'wholly exclude oleomargarine from sale within the state. Schollenberger v. Commonwealth of Pennsylvania, 171 U. S. 1, 18 S. Ct. 757, 43 L. Ed. 49. Until the extreme limit of prohibition is reached the legislature is sovereign.

In view of the revenue that has accrued to the state from the sale of licenses to retail and wholesale oleomargarine dealers, it cannot be said that the license fee fixed by the legislature is so excessive as to be prohibitive. The following table of returns from the oleomargarine tax indicates the contrary:

| Year | Retail Licenses No. | Income from Retail | No. Whsle. Licenses | Income From Whsle. | No. Pounds Whsle. (sold) | No. Pounds Retail (sold) | Av. Tax per Pound Retail | Av. Tax per Pound Whsle. |
|---|---|---|---|---|---|---|---|---|
| 1936–37 | 73 | $ 7,300 | 4 | $1,000 | 372,048 | 513,961 | .01420 | .00269 |
| 1937–38 | 104 | 10,400 | 4 | 1,000 | 514,818 | 640,988 | .01622 | .00194 |
| 1938–39 | 100 | 10,000 | 4 | 1,000 | 227,150 | 374,463 | .02670 | .00442 |
| 1939–40 | 106 | 10,600 | 4 | 1,000 | 299,292 | 396,004 | .02677 | .00334 |
| 1940–41 | 112 | 11,200 | 4 | 1,000 | 416,796 | 431,339 | .02597 | .00240 |
| 1941–42 | 134 | 13,400 | 5 | 1,250 | 477,950 | 499,208 | .02684 | .00262 |
| 1942–43 | 152 | 15,200 | 4 | 1,000 | 318,769 | 518,809 | .02930 | .00314 |
| 1943–44 | 198 | 19,800 | 8 | 2,000 | 705,102 | 678,958 | .02916 | .00284 |
| 1944–45 | 278 | 27,800 | 11 | 2,750 | 749,010 | 943,774 | .02946 | .00367 |
| 1945–46 | 296 | 29,600 | 12 | 3,000 | 702,767 | 707,392 | .04184 | .00427 |

The Act should be declared constitutional and the cause dismissed.

Rehearing denied November 22, 1948.